

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-20-2003

# Schieber v. Philadelphia

Precedential or Non-Precedential: Precedential

Docket 01-2312

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Schieber v. Philadelphia" (2003). *2003 Decisions.* Paper 775.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/775

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed February 20, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 01-2312

SYLVESTER J. SCHIEBER; VICKI A. SCHIEBER, as Co-
Personal Representatives of the Estate of Shannon
Schieber; Sylvester Schieber; Vicki Schieber

v.

CITY OF PHILADELPHIA; STEVEN WOODS, Individually
and as a Police Officer; RAYMOND SCHERFF, Individually
and as a Police Officer

        STEVEN WOODS, Individually and as
        a Police Officer; RAYMOND SCHERFF,
        Individually and as a Police Officer,
        Appellants

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 98-cv-05648)
District Judge: Honorable Norma L. Shapiro

Argued January 25, 2002

BEFORE: NYGAARD and STAPLETON, Circuit Judges , and
SLEET,* District Judge

(Opinion Filed February 20, 2003)

_____

* Honorable Gregory M. Sleet, United States District Judge for the
District of Delaware, sitting by designation.


        Marc L. Fleischaker
        Anne L. Milem
        Arent, Fox, Kintner, Plotkin
         & Kahn
        1050 Connecticut Avenue, N.W.
        Washington, DC 20036
         and
        David Rudovsky (Argued)
        Kairys, Rudovsky, Epstein,
         Messing & Rau
        924 Cherry Street, Suite 500
        Philadelphia, PA 19107
         Attorneys for Appellees

        Jane L. Istvan (Argued)
        City of Philadelphia Law
         Department
        1515 Arch Street
        One Parkway

Philadelphia, PA 19102
Attorney for Appellants

Terry L. Fromson
Women's Law Project
125 South 9th Street, Suite 300
Philadelphia, PA 19107
Attorney for Amici-Appellees

OPINION ANNOUNCING THE JUDGMENT OF THE COURT

STAPLETON, Circuit Judge:

In the early morning hours of May 7, 1998, Shannon Schieber was raped and murdered in her second floor apartment at 251 S. 23rd Street, Philadelphia, Pennsylvania. Ms. Schieber's parents, Sylvester and Vicki, brought this civil rights suit on their own behalf and as representatives of her estate against the City of Philadelphia and Steven Woods and Raymond Scherff, the police officers who responded to a 911 call from one of Schieber's neighbors on the night of her murder. After extensive discovery, Officers Woods and Scherff moved for

summary judgment based in part on their claim to qualified immunity. The District Court denied their motions and they now appeal. For the reasons that follow in this opinion and in Judge Nygaard's separate opinion, the District Court's order denying summary judgment will be reversed, and this matter will be remanded with instructions to enter summary judgment in favor of Officers Woods and Scherff.

I.

The following account of the relevant facts reflects the undisputed evidence in the summary judgment record except where the contrary is expressly noted.

At approximately 1:00 A.M. on May 7, 1998, Ms. Schieber's neighbors, Leah Basickes and Parmatma Greeley, were watching television when they heard a noise that made Greeley think that Schieber was in a "serious domestic dispute." App. at 64. Basickes thought it had come from the adjacent Manning Street and went to the window to check. They discussed their differing views about the source of the noise before Basickes went to bed.

Shortly after 2:00 A.M., while still watching television, Greeley heard what he believed to be a scream and a choking noise coming from Schieber's apartment. He was sufficiently concerned that he left his apartment, crossed the hall, and knocked on Schieber's door. He tried unsuccessfully to open the door and then shouted, but heard no response.

At 2:04 A.M., Greeley called 911 and reported:

My next door neighbor, I just heard her yelling for help . . . Uh, sh-we're on the second floor, . . . we're on one side and she's on the other. And I just heard . . . her yell help. I knocked on the door and I just heard like a . . . choking type sound and I just called.

App. at 432.

When Greeley's call was received by the 911 dispatcher, Officers Woods and Scherff were on patrol in different patrol cars. The dispatcher sent a Priority 1 radio dispatch passing on the "report of a female screaming" at 251 S.

3

23rd Street and calling for immediate assistance. Less than five minutes later, Woods and Scherff arrived simultaneously at the 23rd Street address. They proceeded immediately to the door at that address and encountered a woman inside her living room on the first floor with two windows open. They asked if she had called police with reference to a woman screaming. She responded that she had heard no scream and directed them to another entrance to the building around the corner on Manning Street.

At the Manning Street entrance, Woods and Scherff encountered Greeley and Amy Reed, who lived in the first floor apartment immediately under Ms. Schieber's second floor apartment. Reed had been awakened by Greeley after he heard the scream. The four of them then proceeded to the door of Schieber's apartment where the officers knocked and received no response.

During the next few minutes, the officers interviewed Greeley, Reed, and Christine Ritter, who lived on the third floor directly above Schieber's apartment and appeared on the second floor landing in response to the noise occasioned by the officers knocking on Schieber's door. Reed and Ritter informed the officers that they had been asleep and had heard no scream.[1] Greeley advised that he believed he had heard a scream and a choking noise coming from Schieber's apartment, but upon being

---

1. Reed did advise the officers that before she went to bed, an hour and a half before being awakened by Greeley, she heard something fall to the floor in Schieber's apartment. The sound was not out of the ordinary, however, and did not concern her. As she testified at the deposition:

Q. Was [sic] the noises that you heard prior to Parm [Greeley] waking you up, were those noises that were out of the unusual or were those somethings [sic] that were regularly occurring?

A. I can't say I never heard noises like that before coming from her apartment.

Q. Did the noises that you heard startle you in any way?

        A. No, I thought something probably fell over.

App. at 131.

                                4

questioned about this, expressed some uncertainty. In his
deposition, Greeley recounted what he told the officers in
the following manner:

        Q. What I really want to know is what you told the
        police about the events that occurred before their
        arrival?

        A. I said I heard my neighbor scream for help and a
        choked off sound.

        Q. And a choked off sound?

        A. Yes.

        Q. That's what you told them?

        A. Yes.

        Q. What else did you tell them with regard to what
        you heard?

        A. They asked me if I was sure it came from her place
        or did it come from outside. I said -- I said I'm not --
        I said maybe, when they said are you sure it didn't
        come from outside

* * *

        Q. Did the police ask you if the noise came from a
        different location other than Miss Schieber's
        apartment?

        A. Yes.

* * *

        Q. Let me ask you the question, did the police ask
        you if you believed that the noise came from the
        outside?

        A. Something like that, yes.

        Q. That's paraphrasing what you remember them
        saying?

        A. Yeah.

        Q. Now, in response to that, were you 100 percent
        certain at that time that the noise did come from Miss
        Schieber's apartment?

                                5

A. Well, I said maybe it came from the outside.

Q. Maybe indicating that you may not have been 100 percent sure?

A. Yes.

Q. So it's possible that the noise in your mind did not come from Miss Schieber's apartment?

A. At this point I was getting a little insecure, the whole neighborhood was up, and I was -- when they asked me that, I said maybe.

Q. Did you shrug your shoulders like you did just now?

A. Maybe, I can't remember that, that far.

Q. So when the police were there, it's possible that you could have shrugged your shoulders?

A. It's possible.

App. at 74-75.

Ritter described Greeley's report to the officers as follows:

Q. With respect to the discussion about what Parm [Greeley] had heard, did the police officers inquire whether the noises that he heard could have come from the outside?

A. I believe they did, yes.

Q. And what was Mr. Greeley's response to those questions?

A. His response was uncertain. His response was it could have possibly come from outside, but he believed he heard something inside.

Q. Do you remember hearing him say that it could have possibly come from outside?

A. I do not remember that specific statement specifically. But certainly in the tone of voice and phrasing of his statements, he implied uncertainty.

Q. As you listened to this, was it very clear to you in your own mind that he was expressing uncertainty?

6

MS. APPEL: Objection to the form of the question.

BY MR. WINEBRAKE:

Q. I'm just asking for your observations. Based on your observations, in your mind, did you believe that he was expressing uncertainty?

A. Yes. I understood him to be uncertain, indeed believed him to be uncertain.

* * *

Q. When I asked you questions earlier this afternoon, you testified that at some point Mr. Greeley expressed uncertainty regarding whether or not the sound had come from outside the apartment complex; is that correct?

A. Yes.

Q. Is that your --

A. Although I might say he expressed uncertainty whether it had come from inside as opposed to outside.

Q. In other words, he expressed at some point that he might not be so sure where the sounds came from; is that accurate?

A. Yes, that is accurate.

Q. And he expressed that verbally; am I correct about that?

A. Yes.

    MS. APPEL: Objection to the form.

BY MR. WINEBRAKE:

Q. Were the police officers present when he expressed that?

A. I believe so. However, even had he not explicitedly [sic] said I'm uncertain, his tone of voice, his phrasing of questions and his general behavior would suggest that he was not absolutely certain as to what he heard or where it came from.

Q. And that's while the police were there?

7

A. Certainly.

App. at 209, 219.

In addition to these interviews, the officers checked Schieber's front door, her window, and the door to her balcony and detected no signs of forced entry. They also inspected the alley behind the building.

The police knocked on Schieber's door a second time, this time with the heel of their night sticks, identified themselves as the police, and asked to be admitted. Nothing was heard from within.

The landlord did not live in the building, and at some point during the proceedings, there was a discussion as to whether Schieber's door should be forced open. In the course of that discussion, Greeley stated something to the effect that he would be embarrassed if the officers forced the door and found nothing wrong inside. As the District Court noted, there is a dispute in the record as to whether this statement was volunteered or came only in response to questioning from the officers. Greeley recalls his statement this way:

> After they knocked on the door with the batons and everything I said to them, it's in my statement, I'll be embarrassed if you break down the door and nothing is happening, and I think it was Officer Woods said, we're not going to break down the door, just like that. Then I mean I was in shock at that point. I thought-- I was relieved when the police had come. I'm not trained in breaking down doors, and it was a bit of a put-off.

* * *

> Q. Tell me why you said [you would be embarrassed].
>
> A. Because I thought they were going to break down the door, and I hadn't heard any sounds in so long that I was sort of just at this point he's probably woken up a bunch of people and I was just -- let me phrase this properly. It was my ego on the line. I thought he was going to break down my neighbor's door on my call, so it would be embarrassing if you break down

8

> your neighbor's door and there's nothing happening, don't you think?
>
> Q. At the time you made this statement, did you become unsure as to whether or not the door should be broken in?
>
> A. I thought they were going to break down the door.
>
> MR. SCOTT: Would you read back my question, please.
>
> . . . .
>
> (There was a brief pause in the proceedings.)
>
> . . . .

THE WITNESS: I thought it still should be broken down.

App. at 75, 76. Reed testified that Greeley's statement came in response to a question from the officers as to how he would "feel if they did kick down the door and nothing happened." App. at 136.

As the officers were leaving the premises, they told Greeley, Reed, and Ritter to call 911 if they heard any noise from the apartment and they would return to investigate further. The District Court found that the record as a whole would support an inference that the officers effectively communicated to the neighbors that they should "do nothing but call 911 if they heard additional noise." It was on this basis that the District Court concluded that a trier of fact might find that the officers "greatly increased the risk of harm to Schieber by preventing the neighbors from effectuating rescue themselves." App. at 18.

The record further reveals that the officers were aware that there had been other rapes in the general area in the last year. The officers were at the 23rd Street address less than six minutes. They left without receiving a call on their police radios. They remained on duty until 7:00 A.M.

Both officers gave statements to supervisors the next day and testified at depositions after this suit was filed. Their consistent explanation of their conduct was that they understood they were authorized to make a forced entry if

9

they believed the occupant was inside and in jeopardy and that they would have done so without hesitation if they had been persuaded that this was the case. Greeley was unsure, however, of the source of the scream he heard, and their investigation left them unconvinced that there was a problem inside.

II.

This Court has jurisdiction to review a District Court order denying qualified immunity at the summary judgment stage under the collateral order doctrine to the extent that the denial turns on questions of law. Mitchell v. Forsyth, 472 U.S. 511, 527-28 (1985). We exercise plenary review over the questions of law. See Eddy v. V.I. Water & Power Auth., 256 F.3d 204, 208 (3d Cir. 2001). We have no jurisdiction, however, in an interlocutory appeal to review a District Court's determination that there is sufficient record evidence to support a set of facts under which there would be no immunity. See Johnson v. Jones, 515 U.S. 304, 313 (1995). Thus, where the District Court has adopted a set of facts for the purpose of ruling on the qualified immunity issue, we must accept those facts when reviewing a denial of immunity. Id. at 319. As we recently explained in Forbes v. Township of Lower Merion, 313 F.3d 144 (3d Cir. 2002):

we may "review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right," but we may not "consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." . . . When a defendant argues that a trial judge erred in denying a qualified-immunity summary-judgment motion because the judge was mistaken as to the facts that are subject to genuine dispute, the defendant's argument cannot be entertained under the collateral-order doctrine but must instead await an appeal at the conclusion of the case.

Forbes, 313 F.3d at 147-48 (quoting from Ziccardi v. City of Philadelphia, 288 F.3d 57, 61 (3d Cir. 2002)). In the context of this case, this means that we must accept the District

Court's finding of sufficient evidence to support a finding that a police instruction to do nothing but call 911 stopped the neighbors from effecting rescue themselves. 2

In evaluating a claim of qualified immunity, we must first determine whether the plaintiff has properly asserted a deprivation of a constitutional right; then we can consider whether the right was clearly established at the time of the alleged violation. See Wilson v. Layne, 526 U.S. 603, 609 (1999); Conn v. Gabbert, 526 U.S. 286, 290 (1999). Following this procedure allows courts "to set forth principles which will become the basis for a holding that a right is clearly established" in the future. Saucier v. Katz, 533 U.S. 194, 201 (2001).

III.

Ms. Schieber's parents claim that Officers Woods and Scherff and the City of Philadelphia violated their rights and those of their daughter under the Due Process Clause. With respect to Officers Woods and Scherff, the claim is that they deprived Schieber of assistance from her neighbors that would have saved her life in violation of her constitutionally protected right to personal security.

The case against Officers Woods and Scherff is predicated

---

2. The defendants correctly insist that no one testified that the officers used the words "do nothing but call 911." Nevertheless, the District Court found that the record as a whole would support a finding that this was the message conveyed by them. This was not an inadvertent slip of the pen. The District Court expressly recognized that the state created danger doctrine requires a showing that the state created or increased the risk of injury to the injured party and denied summary judgment solely because a trier of fact could find this to be the case here. The central holding of the District Court's opinion was as follows:

Here, the officers' decision to: (1) leave without forcing Schieber's

door; and (2) instruct the neighbors to do nothing but call 911 if they heard additional noise, greatly increased the risk of harm to Schieber by preventing the neighbors from effectuating rescue themselves.

App. at 18. Accordingly, we may not review whether the District Court erred in its conclusion regarding the message conveyed.

on the state-created danger doctrine. That doctrine had its origin in DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989), where the Supreme Court considered whether the Due Process Clause of the Fourteenth Amendment imposed upon the state an affirmative duty to protect a child from domestic abuse when a state actor had knowledge of prior suspicious injuries. The Court held that in the absence of special circumstances the state has no duty to protect a person from private violence. It reasoned that:

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors . . . . It forbids the State itself to deprive individuals of life, liberty or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

Id. at 195. While the Court recognized that there are situations in which the state assumes affirmative duties to protect from harm, it concluded that the state had assumed no responsibility to protect Joshua, the victim of the abuse. As the Court noted: "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201.

Although the last quoted language effectively ended the plaintiff's case in DeShaney, this and other courts have read this passage to indicate that a constitutional violation may occur when the state acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention. See Kneipp v. Tedder, 95 F.3d 1199, 1205 (3d Cir. 1996) (citing cases); Mark v. Borough of Hatboro, 51 F.3d 1137, 1151-52 (3d Cir. 1995) (citing cases). Indeed, we have held that a plaintiff may recover on a "state-created danger theory" under the Due Process Clause upon a showing that:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful

disregard for the safety of the plaintiff; (3) there existed
some relationship between the state and the plaintiff;
[and] (4) the state actors used their authority to create
an opportunity that otherwise would not have existed
for the third party's crime to occur.

Kneipp, 95 F.3d at 1208 (quoting Mark , 51 F.3d at 1152).

As the District Court correctly perceived, our summary of
the law regarding state created dangers in Kneipp needs to
be updated to reflect the Supreme Court's subsequent
decision in County of Sacramento v. Lewis, 523 U.S. 833
(1998). In Lewis, the Supreme Court granted certiorari "to
resolve a conflict among the Circuits over the standard of
culpability on the part of a law enforcement officer for
violating substantive due process in a pursuit case." 523
U.S. at 839. In considering the appropriate substantive due
process standard, the Court emphasized that " 'the
touchstone of due process is protection of the individual
against arbitrary action of the government.' " Id. at 845
(quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). The
Court cautioned, however, that its "cases dealing with . . .
executive action have repeatedly emphasized that only the
most egregious official conduct can be said to be arbitrary
in the constitutional sense." Id. at 846 (quotation omitted).
The Court accordingly concluded that to prove a violation of
substantive due process in cases involving executive action,
the plaintiff must show that the state acted in a manner
that "shocks the conscience." Id. As we summarized in
Miller: "To generate liability, executive action must be so ill-
conceived or malicious that it 'shocks the conscience.' " 174
F.3d at 375 (quoting Lewis, 523 U.S. at 846).

Since Lewis, we have had occasion to apply this
substantive due process standard in a number of different
settings and we must, of course, apply it here. See Ziccardi
v. City of Philadelphia, 288 F.3d 57, 58 (3d Cir. 2002)
(applying "shocks the conscience" test to claim against
paramedics whose handling of plaintiff following a fall
allegedly caused his quadriplegia); Nicini v. Morra, 212 F.3d
798, 800 (3d Cir. 2000) (en banc) (applying the"shocks the
conscience" test to the substantive due process claims of a
plaintiff who had been abused by a member of a family with
whom he had been placed for foster care); Miller, 174 F.3d

13

at 370 (applying the "shocks the conscience" test to the
claim of a mother and her children for an alleged violation
based on "an emergency ex parte child custody hearing"
after which the City defendants removed two of Miller's
children from her custody).

Whether executive action is conscience shocking and
thus "arbitrary in the constitutional sense" depends on the
context in which the action takes place. In particular, the
degree of culpability required to meet the "shock the
conscience" standard depends upon the particular
circumstances that confront those acting on the state's

behalf. As the Court explained in Lewis:

> We have . . . rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. . . . It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level. . . .

> Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence . . . is a matter for closer calls.

* * *

> Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

523 U.S. at 848-49, 850 (quotation omitted). Accordingly, with the guidance of Lewis and its progeny, I will undertake

14

the required "exact analysis of [the] circumstances" facing Officers Woods and Scherff on the morning of May 7, 1998.

IV.

The Lewis Court ultimately held "that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." Id. at 854. The analysis it followed in reaching this conclusion compared the circumstances of officers in high-speed chases, prison doctors in providing health care, and prison managers in dealing with riots. In the course of that comparison, the Court identifies the kinds of factors that should be considered in deciding whether and when executive action shocks the conscience. The Court began by pointing out that prison doctors face liability if they are deliberately indifferent to the serious medical needs of their prisoners. It noted that the "deliberate indifference" standard "is sensibly employed only when actual deliberation is practical, . . . and [that] in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a

prisoner to exercise ordinary responsibility for his own welfare." Id. at 851 (citing Whitley v. Albert, 475 U.S. 312, 320 (1986)). Moreover, the Court stressed that no "substantial countervailing interest[s] excuse the State from making provision for the decent care and protection of those it locks up." Id. Thus, "the State's responsibility to attend to the medical needs of prisoners [or detainees] does not ordinarily clash with other equally important governmental responsibilities." Id. at 851-52 (quoting Whitley, 475 U.S. at 320) (alteration in original).

By contrast, in the prison riot setting, liability turns on " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " Id. at 853 (quoting Whitley, 475 U.S. at 320-21)). In such circumstances, "prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be

15

used. . . . In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." Id. at 852 (quoting Whitley, 475 U.S. at 320) (alteration in original).

The Supreme Court found the circumstance of an officer in a high-speed chase much closer to that of the prison managers required to deal with a riot:

> Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance." Id., at 320; cf. Graham v. Connor, 490 U.S., at 397 ("[P]olice officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving[.]"). A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders.

> To recognize a substantive due process violation in these circumstances when only midlevel fault has been shown would be to forget that liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make

unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the

16

shock that implicates "the large concerns of the governors and the governed."

Lewis, 523 U.S. at 853.

There are several lessons from Lewis that are relevant here. The first, of course, is that negligence is not enough to shock the conscience under any circumstances. The second is that more culpability is required to shock the conscience to the extent that state actors are required to act promptly and under pressure. Moreover, the same is true to the extent the responsibilities of the state actors require a judgment between competing, legitimate interests. With these lessons in mind, I turn to the circumstances of this case.

Officers Woods and Scherff arrived promptly at 251 S. 23rd Street in the early morning hours of May 7, 1998, in response to advice that a man had reported hearing a woman scream. They conducted an investigation that included speaking with each of the available witnesses, ascertaining that there were no signs of forced entry, and establishing that no response could be secured from within Ms. Schieber's apartment. The occupants of the apartments immediately above and below Schieber's heard no scream, and another inhabitant of the first floor of the building heard none. The neighbor who had made the 911 call believed that there had been a scream and that it had come from Schieber's apartment, but he was the only one who had heard a scream and he exhibited uncertainty about its source.

The information revealed by the officers' investigation was consistent with three situations: (1) Greeley was mistaken about the scream or its source and Schieber was not home; (2) Greeley was mistaken about the scream or its source and Schieber was at home and did not wish to be disturbed; or (3) Greeley was right, and Schieber was at home and the victim of violence. Given the absence of any sign of forced entry and the fact that no other neighbors heard the scream, in the absence of Greeley's report, the first two possibilities were infinitely more likely than the third. Accordingly, a decision about which of these possibilities was the more likely depended on an evaluation of the accuracy of Greeley's perception.

17

The circumstances confronting Woods and Scherff were such that it was unlikely that additional relevant information would become available to them soon and, if Greeley were correct, any action to render meaningful aid to Schieber would have to be taken without delay in order to have any chance of accomplishing its objective. Accordingly, a quick, on-the-spot decision was required on whether to forcibly open Schieber's door, and that decision had to be made on the basis of the limited information then available.

Most importantly, the decision on forcible entry of Schieber's home involved important competing interests. There was some possibility that Schieber's constitutionally protected interest in personal security was in jeopardy, but it was certain that forcible entry would infringe on her constitutionally protected interest in privacy.

While it is true that Woods and Scherff were not required to exercise an instantaneous judgment, like an officer in a chase situation, this was nevertheless far from the situation of prison doctors where "extended opportunities to do better [may be] teamed with protracted failure even to care." Lewis, 523 U.S. at 853. Woods and Scherff were required to make a decision without delay and under the pressure that comes from knowing that the decision must be made on necessarily limited information. The required judgment involved the weighing of the important competing interests of personal security and privacy. This, in turn, required an assessment of the likelihood of Schieber's being in jeopardy, which in turn required an evaluation of the reliability of Greeley's report. The officers made the required judgment, and their discourse with the neighbors vouches that their focus was on the relevant considerations -- the reliability of Greeley's account and the impact of forced entry on Schieber's privacy interests. Nothing in the record would support an inference that the officers were influenced in any way by self-interest or any other inappropriate consideration. In short, Woods and Scherff made a good faith judgment required by their official responsibilities.[3]

_____

3. Pointing to isolated segments of the interviews given by Officers Woods and Scherff, the next day, Schieber's parents suggest that the officers refused to enter "not because [Greeley] was uncertain with respect to the

It may well be that these circumstances, like those in Lewis, call for something more than a finding of "mid-level fault" as a predicate for a conclusion that the officers' conduct shocks the conscience. Certainly this situation is much closer to that presented by Lewis than to that of a prison physician deciding whether to treat a serious medical need. Moreover, if intent to harm is the necessary predicate here, clearly no reasonable jury could find that Woods or Scherff possessed that state of mind. Judge Nygaard and I find it unnecessary to hold that an intent to harm is required here, however, because we believe it

equally clear that the current record will not support a finding of deliberate indifference to Schieber's rights and that, accordingly, the conduct of Officers Woods and Scherff cannot be found to shock the conscience.

The deliberate indifference prison standard spoken of in Lewis is equivalent to the concept of recklessness utilized in the criminal law. Farmer v. Brennan, 511 U.S. 825, 837 (1994). It requires that the prison doctor or custodian have an actual, subjective appreciation of an excessive risk of serious harm to inmate health or safety and that he or she "consciously disregard" that risk. Id. at 839 (quoting Model Penal Code S 202(2)(c)).4 While Officers Woods and Scherff

_____

source of the screams . . . , but because they had decided in advance that they would not enter unless they personally heard a call for help or had the approval of a supervisor." Appellees' Br. at 10-11. The record would not support such a finding. Scherff did state that he would not have taken down the door unless he himself heard a cry for help from inside Schieber's apartment, but he made this statement after, and in the context of, his explanation that there were no signs of forced entry, no one other than Greeley had heard a scream, and Greeley was uncertain about the source of the scream he believed he had heard. It is clear from their statements and depositions that both officers understood that the police are authorized to make a forced entry in order to prevent death or physical injury and that they would have done so in this instance had they believed that Schieber was a victim of violence. The fact that Woods may have sought the counsel of a supervisor before taking down the door hardly supports a conclusion that he acted with deliberate indifference.

4. In another context, the Supreme Court has suggested that an official's deliberate indifference may exist in the absence of subjective

19

appreciated the possibility that Schieber was a victim of violence, they cannot be said to have consciously disregarded that risk. To the contrary, they arrived promptly, conducted an appropriate investigation, and made a conscious judgment which took that risk into account. While one can argue with the benefit of hindsight that these officers exercised poor judgment and were thus guilty of negligence, a reasonable trier of fact could not find that they were deliberately indifferent to Schieber's constitutional rights.5

Moreover, even accepting, as we do, that Woods and Scherff advised the neighbors to do nothing but call 911 if they heard further noise, this does not alter our conclusion that their conduct could not be found to be shocking to the conscience. Having concluded that there was an insufficient basis to warrant a peace officer in making a forced entry, it necessarily followed that the officers believed there was an insufficient basis for private forced entry and that Greeley had done the right thing in calling 911 and allowing the police to make a judgment. If, as Schieber's parents maintain, the officers' advice caused the neighbors to

refrain from forcing the door following the officers'
departure, that advice can hardly be said to shock the
conscience under the circumstances reflected in the
undisputed evidence in this record. Accordingly, Judge
Nygaard and I conclude that there was no due process
violation.

Our decisions in Miller and Ziccardi are supportive of this
conclusion. In Miller, we evaluated the actions of a social
worker who, after receiving allegations of abuse, took steps
to separate a child from her natural parent. In that

_____

appreciation when the excessive risk of harm is so obvious that it should
be known. See Farmer, 511 U.S. at 840-41 (discussing Canton v. Harris,
489 U.S. 378 (1989) and the civil tort concept of recklessness). Here
there is no dispute that the officers had a subjective awareness of the
possibility that Schieber may have been a victim of violence.

5. It may well be, as the dissent suggests, that it would have been better
investigative technique to ask more "open ended questions" of Greeley. If
so, that fact might support a finding of negligence on the part of the
officers. It would not, however, support a finding that they were
deliberately indifferent to Schieber's welfare.

20

situation, like the present one, the state actor was required
to make a judgment between conflicting interests-- those
of the parent in the child and those of the state in the
child's welfare -- and to evaluate the impact of the state's
intervention on those interests. Moreover, while the Court
recognized "that a social worker acting to separate parent
and child does not usually act in the hyper-pressurized
environment of a prison riot or a high-speed chase," it
observed that "he or she rarely will have the luxury of
proceeding in a deliberate fashion, as prison medical
officials can." 174 F.3d at 375. We ultimately concluded
that "in order for liability to attach, a social worker need
not have acted with the 'purpose to cause harm,' but the
standard of culpability . . . must exceed both negligence
and deliberate indifference." Id. We held that this degree of
culpability was not present.

In Ziccardi, we found that the applicable standard of
culpability for paramedics seeking to aid an accident victim
was the same as that for the social worker in Miller, and we
elaborated on the concept of a degree of culpability greater
than subjective deliberate indifference though less than
subjective intent to harm. In that case, two paramedics
responded to a neighbor's 911 call reporting that a man
was in distress after having fallen from an eight foot wall to
the sidewalk below. Instead of immobilizing the plaintiff's
cervical spine before moving him, the paramedics lifted him
by his arms and then by his shoulders and legs, allegedly
causing quadriplegia. As in Miller, we noted the difference
between the responsibilities of a paramedic and those of a
physician treating institutionalized patients:

Miller's reason for holding that more than deliberate indifference had to be shown -- the social worker's need to act without "the luxury of proceeding in a deliberate fashion," id. at 375 -- seems equally applicable here. While the record in the present case does not suggest that the appellants had any particular need to move Smith quickly -- for example, he was not in a dangerous location and did not appear to have any other medical problems requiring prompt movement-- the social worker in Miller similarly does not appear to have had a need to make a split-second decision. What

21

the Miller court seems to have had in mind was the need for the social worker to act in a matter of hours or minutes. Nevertheless, the Miller court held that the nature of the situation faced by the social worker mandated proof of something more than subjective deliberate indifference, and this holding seems to require the application of a similar standard here.

Ziccardi, 288 F.3d at 65.

We then went on to more clearly articulate this standard of culpability.

Miller thus appears to have demanded proof of something less than knowledge that the harm was practically certain but more than knowledge that there was a substantial risk that the harm would occur. A simple way of putting this is that Miller mandated proof that the defendant was aware of more than a substantial risk -- let us say a great risk -- that there was no good cause for the removal of the children.

* * *

 In summary, then, we understand Miller to require in a case such as the one before us, proof that the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result if, knowing Smith was seriously injured, they moved Smith without support for his back and neck.

Ziccardi, 288 F.3d at 66.

I believe that a comparison of the situation confronting Officers Woods and Scherff with those confronting the social worker in Miller and the paramedics in Ziccardi suggests that liability could exist here only if Woods and Scherff subjectively appreciated and consciously ignored a great, i.e., more than substantial, risk that the failure to break down Schieber's door would result in significant harm to her. Clearly, the record would not support such a finding. Nevertheless, just as I have found it unnecessary to determine whether the Lewis "intent to harm" standard is applicable, I also find it unnecessary to adopt the

Miller/Ziccardi standard. Because the record would not

support a finding of more than negligence on the part of Woods and Scherff, the result we reach follows a fortiori from that reached in Miller and Ziccardi .

Because I conclude that the record will not support a conclusion that the officers' conduct shocks the conscience, I do not reach the issue of whether they used their state authority to render Schieber more vulnerable to private violence. Moreover, because I conclude that no constitutional violation occurred, I need not reach the qualified immunity issue.6

V.

The order of the District Court entered May 9, 2001, will be reversed and this matter will be remanded with instructions to enter summary judgment in favor of Officers Woods and Scherff.

_____

6. I also express no view on whether the Schiebers, as parents, had a liberty interest in the continued companionship of their adult, emancipated child. Compare Trujilo v. Bd. of Cty. Comm'rs,  768 F.2d 1186 (10th Cir. 1985); Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir. 1984), with Butera v. District of Columbia, 235 F.3d 637 (D.C. Cir. 2001); Ortiz v. Burgos, 807 F.2d 6 (1st Cir. 1986). Nor do I express an opinion as to whether we have jurisdiction to consider that issue in an appeal from a denial of a claim of qualified immunity.

NYGAARD, Circuit Judge, Concurring:

I agree with much of what Judge Stapleton has written in his excellent opinion, and concur in its judgment. I write separately, however, first because I take a different view of the Supreme Court's decision in Johnson v. Jones, 515 U.S. 304 (1995), and second to more fully explain my view of the test for affirmative acts under the "state-created danger" exception contained in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195 (1989).

Judge Stapleton's opinion interprets Johnson v. Jones to require that we accept the facts found by the District Court. With this, I fully agree. Having said that, I would not base our analysis upon a statement made by the District Court, in its discussion of the issues, that the police instructed Ms. Schieber's neighbors "to do nothing but call 911" if they heard additional noise. See Opinion at p.11. The problem is that this is not one of the facts specifically found by the District Court. Instead, in the "Facts" section of its opinion, the District Court found:

        Neighbors, having been assured by the officers that

> Schieber was not home and told by the officers to call 911 again if they heard any other noises from the apartment, took no further action.

Schieber v. City of Phila., 156 F. Supp. 2d 451, 455 (E.D. Pa. 2001). It is only in the "Discussion" portion of the District Court's opinion that it suggests, without fact-finding to support it, that the officers decided to"instruct the neighbors to do nothing but call 911 if they heard additional noise." Id. at 460.

The Supreme Court instructed us in Johnson v. Jones to "take, as given, the facts that the district court assumed when it denied summary judgment." 515 U.S. at 319. When, as here, the "Facts" found by the District Court are inconsistent with a statement it makes in its "Discussion," I would base my analysis on the facts specifically found by the District Court.

When the District Court has not explicitly stated its facts, the Supreme Court instructs that we "may have to undertake a cumbersome review of the record to determine

24

what facts the district court, in the light most favorable to the nonmoving party, likely assumed." Id. Out of caution I reviewed the record and I found no evidence to support a statement that the officers told Ms. Schieber's neighbors "to do nothing but call 911" if they heard additional noise. Indeed, Judge Stapleton and I agree that there was no testimony that the officers ever made such a statement. See Opinion at n.2. Even the Schiebers themselves never attempted to support this allegation in their briefs or at oral argument. This further supports my reasoning that the relevant facts are those set out in the "Facts" portion of the District Court's opinion. Consequently, my analysis follows a different path than does Judge Stapleton's, although we both reach the same result.

It is well established under DeShaney that the state has no constitutional obligation to protect its citizens from each other. Because there is no constitutional requirement that the State provide protective or rescue services,"it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." DeShaney, 489 U.S. at 196-97. Thus, our baseline for analysis is that the officers in this case cannot be held liable simply for failing to break down Ms. Schieber's door.

Recognizing as much, the Schiebers have attempted to fit their claim within a narrow exception to the DeShaney rule known as the "state-created danger" exception. That exception only applies when the state has created a harm or renders someone more vulnerable to an existing harm. Id. at 201. Courts have found under this exception that the state may incur an affirmative duty to rescue if it deprives someone of private sources of rescue. See, e.g. , Ross v.

United States, 910 F.2d 1422 (7th Cir. 1990) (finding a constitutional claim was stated where a deputy ordered civilian scuba divers to cease their rescue of a drowning boy, blocked them with his boat, and threatened to arrest them).

Judge Stapleton's opinion applies the four-part state-created danger test we enunciated in Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996). I do not disagree with its analysis as far as it goes. Nonetheless, in my view the test for

liability must start with D.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir. 1992) (en banc), in which we emphasized that the state must have committed an affirmative act before it can be held constitutionally liable under the state-created danger exception. Sitting en banc in D.R., we noted that the genesis of the exception was the Supreme Court's language in DeShaney that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 1373 (quoting DeShaney, 489 U.S. at 201). We went on to consider the development of the exception and observed that "[p]ost-DeShaney courts have tracked the quoted Supreme Court's language by asking whether the state actors involved affirmatively acted to create plaintiff 's danger, or to render him or her more vulnerable to it." Id . (emphasis added). Finally, we concluded that "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." Id. at 1374 (emphasis added). Hence, the State can be liable only when it has committed an affirmative act, without which, we do not reach the Kneipp test. Because the District Court made no factual finding that there was an affirmative act by the State, i.e., the officers simply told neighbors to "call 911," I would conclude that there can be no liability.

Finally, while there are thus significant differences in my analysis, I am in full agreement with Judge Stapleton that, assuming the officers had directed the neighbors"to do nothing but call 911," their conduct still did not rise to the level necessary to establish a state-created danger claim under Kneipp.

For these reasons, I concur.

SLEET, District Judge, Dissenting:

This case is on review at the summary judgment stage of these proceedings because the District Court rejected the appellants' contention that the shield of qualified immunity protects them from liability for the appellees' claimed

injuries. In his opinion, Judge Stapleton states that, at this interlocutory stage of these proceedings, we must accept the "District Court's determination that there is sufficient record evidence to support a set of facts under which there would be no immunity." See Johnson v. Jones , 515 U.S. 304, 313 (1995). Thus, he states that we "must accept the District Court's finding of sufficient evidence to support a finding that a police instruction to do nothing but call 911 stopped the neighbors from effecting rescue themselves."1 (emphasis in the original). As such, it appears that Judge Stapleton reads Johnson to require that an appeals court limit its review of the pretrial record to those instances where the court is unable to determine from the trial court's ruling the facts it relied upon when it denied summary judgment. In other words, he seems to read Johnson to direct the effort of the court of appeals to whether it can discern from the trial court's ruling the facts it likely assumed, rather than whether that court's factual assumptions are set forth explicitly in its opinion. In the case before us, Judge Stapleton believed that he was able to determine those facts from the body of the District Court's opinion. Thus, he found no need to look beyond the four corners of that opinion.

In his concurrence, Judge Nygaard agrees that "we must accept the facts found by the District Court." He seems also to agree with Judge Stapleton's conclusion that the appellate court's review of the pretrial record is limited to those instances noted above. Judge Nygaard does not appear to agree, however, that the District Court's opinion in the matter before us adequately reveals the set of facts it assumed in rendering its immunity decision. Specifically, Judge Nygaard states that "[w]hen, as here, the 'Facts'

_____

1. Judge Stapleton notes that "the District Court found that the record as a whole supported the finding that the message conveyed by the officers was to do nothing but call 911."

found by the District Court are inconsistent with a statement it makes in its 'Discussion,' I would base my analysis on the facts specifically found by the District Court." Thus, it appears there is a difference in view as to what the Court meant in Johnson when discussing an appellate court's determination of the set of facts the District Court assumed in ruling on a purely legal question presented by an assertion of qualified immunity. In other words, Judge Nygaard seems to differ with Judge Stapleton as to where we should look and how we should determine the facts assumed by the trial court in rendering its decision.

In his concurrence, Judge Nygaard states that "out of caution," he reviewed the pretrial record before us. It would seem that the need for caution here was prompted by the District Court's failure to set forth in explicit terms, either in the facts or background section of its opinion or in a

manner clearly identifying it as such, the specific finding of fact that the officers gave the 911 instruction. Whether or not that was the catalyst, after his review of the record, Judge Nygaard found no support for the District Court's finding of fact that the officers told the neighbors"to do nothing but call 911." (emphasis in the original). Nevertheless, he agreed, albeit for different reasons, with Judge Stapleton's conclusion.

I am unable to agree with my colleagues' restrictive reading of Johnson. I too have reviewed the record, and in so doing, have concluded that there is a genuine issue as to whether the conduct of the officers violated clearly established law. I, therefore, respectfully dissent.

We exercise jurisdiction over this matter because, presumably, the question presented is purely legal, and not "whether or not [the] record demonstrates a'genuine issue of fact for trial.' " Johnson 515 U.S. at 316. In Johnson, the Court wrestled with the challenge of separating reviewable immunity determinations of the District Court from those that are not. The Court discussed and analyzed the "competing considerations," the wise use of appellate resources among them, involved in the question of limiting " 'qualified immunity' matters to cases presenting more abstract issues of law." Id. at 317. Among other reasons to

28

limit review of the pretrial record in immunity questions, the Court felt that it would be an unwise use of the resources of appellate courts to examine "questions about whether or not a record demonstrates" the presence of a triable issue because such questions "can consume inordinate amounts of appellate time." Id. at 316. Thus, the Court stated, "When faced with an argument that the District Court mistakenly identified clearly established law, the court of appeals can simply take, as given, the facts that the District Court assumed when it denied summary judgment for that (purely legal) reason." Id. at 319 (emphasis added).

Contrary to the view expressed by my colleagues, I believe the language used by the Court does not require acceptance of the facts assumed. It simply suggests that when the trial court sets forth its factual findings, courts of appeal need not "undertake a cumbersome review of the record to determine what facts the District Court . . . likely assumed." Id. at 319. Conversely, the Court recognized that when the trial court fails to articulate the factual underpinning for its summary judgment ruling on a legal question, the court of appeals may have to engage in such a review. Clearly, in order to enable courts of appeal to operate more efficiently, and for the other reasons stated in its opinion in Johnson, the Court would prefer that trial courts say something in this regard. The Court did not say, however, that it intended to restrict the ability of our circuit courts to review a record only to these instances. In other words, Johnson should not be read to stand for the

proposition that, even though the District Court's specific factual findings do not support its legal conclusions, when there is, in fact, support in the record for those conclusions, those facts should be ignored. If that is what Johnson means, circuit courts will be confined to the four corners of whatever the trial court says are the facts, and the legal conclusions based thereon -- no matter how incorrect. This cannot be the result intended by the Court. Nor do I believe that my reading of Johnson offers what might be viewed as a loophole through which appellate courts can circumvent the limited constraints the Court has placed upon their ability to review immunity determinations by District Courts.

Keeping the applicable summary judgment principles as well as the teachings of Johnson v. Jones in mind, I believe that the only conclusion the present pretrial record supports is that there is a genuine issue for trial on the question of whether the conduct of the officers in this case shocks the conscience.

At his deposition Greeley testified as follows:

> Q. And after Officer[s] Scherff and Woods left your building and while you were up watching The Terminator, you didn't hear any sounds coming from Miss Schieber's apartment, correct?
>
> A. Correct.
>
> Q. And the reason why you didn't take any affirmative steps to take the door down was because you didn't hear any sounds coming from Miss Schieber's door, is that true -- I'm sorry, Miss Schieber's apartment?
>
> A. Any further sounds after they had left?
>
> Q. Yes.
>
> A. Correct.
>
> Q. So let me just ask it clearer, is the reason that you didn't take down Miss Schieber's door after the officers left while you were still awake was because you didn't hear any sounds coming from Miss Schieber's apartment?
>
> A. Not entirely.
>
> Q. Was it one of the reasons?
>
> A. I mean it's hard for me to predict what -- if I hear anymore noise what I would have done. That's sort of -- but as far as I was concerned, once the police left, I was -- it was in their hands to break down the door because that's what they're trained to do. I don't look at it as my -- I'm not trained to do so and I wasn't.

Q. But had you heard some sounds, you would have
taken some affirmative actions?

A. Probably, yes.

30

App. at 86.

Further, Greeley testified that, before the police arrived,
he had considered knocking down the door. However, when
asked what prevented him from doing so, he responded
that "I'd be endangering Leah [Greeley's companion]
possibly, I'd be endangering myself . . . . I'm not trained to
be breaking down people's doors . . . ." App. at 71. The
record also reveals that, prior to the arrival of the officers,
Greeley went downstairs to Reed's apartment to seek
assistance from an individual named Hooman. At the time,
according to Greeley's testimony, he was considering
breaking down Ms. Schieber's door. Unfortunately, Hooman
was not there.

Given this record, the question of the impact of the 911
instruction on the neighbors, and whether it prevented Ms.
Schieber's private rescue is one best left for a jury. That is,
even if the specific instruction to do nothing but call 911
was not given by the officers, a jury should be permitted to
determine whether "the record as a whole support[s] the
finding that the message conveyed by the officers was to do
nothing but call 911."

These, however, are not the only material facts developed
in the pretrial record that are relevant to the question of the
propriety of the officers' conduct, and whether that conduct
is actionable. This presents two problems. First, Judge
Stapleton's analysis of the officers' actions during their
investigation does not go far enough. Put differently, and
perhaps more accurately, the focus of the analysis is
unduly narrow. Second, Judge Stapleton finds that a trier
of fact could not properly conclude that the officers were
deliberately indifferent to Ms. Schieber's constitutional
rights because they "conducted an appropriate
investigation." I do not agree that the record evidence
supports this conclusion. More fundamentally, I cannot
agree that, given the record in this case, this is a
conclusion that is within the competence of this court to
make at this time. I will discuss each of these points in
turn.

Judge Stapleton's opinion focuses its attention almost
exclusively on the District Court's finding that the officers

31

instructed Greeley and the other neighbors who were
present that, should they hear anything else, they were to
do nothing themselves, and instead, call 911 for police

assistance. If that is all the officers did during their investigation, a stronger argument could certainly be made that, as a matter of law, this action does not demonstrate the type of deliberate indifference that, under the circumstances, shocks the conscience. It is not, however, all that was done.

Amy Reed was one of the neighbors at the scene when Woods and Scherff arrived. Reed provided the following testimony:

> Q. Was there a conversation that you observed that took place between Mr. Greeley and the police after the police stopped knocking?
>
> A. I did hear a conversation between them.
>
> Q. Do you recall, sitting here today, what the conversation consisted of ?
>
> A. I remember as they were -- or let me step back. I remember them -- they had suggested some alternative possibilities for what he might have heard.
>
> Q. Do you recall what alternative possibilities the police may have suggested?
>
> A. They suggested that since it was 2 o'clock or thereabouts, that maybe people coming out of a bar, the noise had reached his apartment or perhaps he heard noises bouncing off of nearby buildings or walls in his apartment.
>
> Q. Did Mr. Greeley respond in anyway?
>
> A. Yes. He did not look favorably upon those explanations.
>
> Q. But did he respond to them?
>
> A. When they asked him, "Perhaps you heard people on the street", (sic) he said something like,"No, I don't think so, no."

32

> Q. In your presence, did he ever express uncertainty as to where he believed the noises were coming from inside the -- noises were coming from?
>
> A. He was quite certain what he had heard, who he had heard and where it had come from when he woke me up. He relayed that to the police. . . .2

App. at 31-32.

There is expert testimony in the record that establishes that when conducting an investigation of this type, police officers should ask open ended questions of witnesses

rather than making suggestions of the type reflected in the exchange described by Reed. Judge Stapleton's opinion does not seem to consider the effect of this conduct on this investigation, other than its impact on the behavior of the private citizens at the scene. In my view, this renders his analysis critically flawed.

I believe this to be so for the following reasons. The result of what the appellees characterize as the officers'"cross-examination" of Greeley was that he appeared to be "uncertain" about the source of the noises he'd heard that morning. The appellees contend that the result of the use of this arguably improper investigative technique, along with the officers' refusal to enter the apartment, was to "cause any private citizen to believe that he too was barred from making such entry." Appellees Brief at 28-29. This argument sums up the difficulty I have with Judge Stapleton's analysis of the facts. If Greeley was in fact uncertain, this uncertainty may have resulted from improper questioning by the officers. Thus, while Judge Stapleton focuses his attention upon the impact of the "911 instruction" on the neighbors, the record evidence, e.g., Reed's testimony as well as expert opinion, establishes that there is a need for a broader inquiry.

---

2. Judge Stapleton writes that when the officers arrived and Greeley reported the source of the scream, "he exhibited uncertainty about its source." Reed's testimony alone would seem to put this fact squarely at issue. Thus, I believe the District Court's conclusion that Greeley was uncertain places Judge Stapleton in the untenable position of weighing this evidence. This is a job for a jury, not an appellate court.

33

This inquiry must be guided by more than just the court's instincts or sense of what it believes should be the quantum of evidence necessary for a finding of liability in circumstances like those before the court. For guidance, Judge Stapleton looks to the Supreme Court's decision in County of Sacramento v. Lewis, 523 U.S. 833 (1998). He notes that Lewis teaches that there are two critical prerequisites to determining whether a tort of constitutional proportions has been committed: first, an understanding that "whether executive action is conscience shocking and thus 'arbitrary in the constitutional sense' depends on the context in which the action takes place," and second, an exact analysis must be conducted of the circumstances confronting the decision maker. See Lewis, 523 U.S. at 848-850. Judge Stapleton purports to adhere to this mandate, however, I do not believe the effort can withstand close scrutiny. Herein lies the source of my next, and last, disagreement with his view.

Judge Stapleton writes that "[c]ertainly this situation is much closer to that in Lewis [which involved a high speed vehicle pursuit] than to that of a prison physician deciding whether to treat a serious medical need." In other words, he concludes that, although "an instantaneous judgment" was

not required, there was insufficient time to engage in extended deliberation. Thus, Judge Stapleton suggests that "[i]t may well be that these circumstances, like those in Lewis, call for something more than a finding of'mid-level fault' as a predicate for a conclusion that the officers' conduct shocks the conscience." It is somewhat unclear as to whether Judge Stapleton would, under circumstances such as these, require proof of intentional conduct. He reasons that he need not reach that issue. Instead, he concludes that "the current record will not support a finding of deliberate indifference."

Again looking to the Supreme Court for guidance, Judge Stapleton concludes that the Lewis and Farmer v. Brennan, 511 U.S. 825, 837 (1994), cases support the finding that deliberate indifference incorporates the concept of reckless behavior. More specifically, analogizing to the prison doctor situation, he concludes that, in order to find that Scherff and Woods were deliberately indifferent to Ms. Schieber's

plight, the record evidence would have to support the conclusion that they had "an actual, subjective appreciation of an excessive risk of serious harm to [Ms. Schieber] and that [they] 'consciously disregar[ed]' that risk." The underpinning for this conclusion is found in the following statement by Judge Stapleton:

> Woods and Scherff were required to make a decision without delay and under the pressure that comes from knowing that the decision must be made on necessarily limited information. The required judgment involved the weighing of the important competing interests of personal security and privacy. This in turn required an evaluation of the dependability of Greeley's report. The officers made the required judgment, and their discourse with the neighbors vouches that their focus was on the relevant considerations - the reliability of Greeley's account and the impact of forced entry on [Ms. Schieber's] privacy interests.

As Judge Stapleton writes, placement in the proper context is critical in determining "the degree of culpability required to meet the 'shock the conscience' standard." At the outset, I question whether he has placed the facts and circumstances of this case in the proper context as is required by Lewis.

Judge Stapleton reasons that this case is "far from the situation of prison doctors." First, I do not agree that the instant facts place this case either "much closer to that in Lewis" or "far from the situation of the prison doctors." The facts and expertise upon which the court relies to reach this determination are unclear to me. Judge Stapleton writes that the officers "were required to make a decision without delay and under the pressure that comes from knowing that the decision must be made on necessarily limited information." To the contrary, the record reveals

that at least one hour elapsed from the first report to the police of noises from the Schieber apartment to when the officers arrived on the scene. Further, upon their arrival, they heard no further noises nor did they see any signs of forced entry. Of course, the argument could be made that, as a result of these facts, every second counted. But the facts tend to belie this conclusion. If the officers believed

themselves under that kind of pressure, it seems that upon arrival at the scene, given Greeley's initial report of cries for help, proper police procedure would have dictated that they break the door in immediately. Regardless, however, of whether this would have been the proper procedure, the officers took the time to survey the outside of the apartment for signs of forced entry. They also spoke with at least two witnesses regarding their observations -- questioning one, Greeley, rather extensively. Thus, while I can agree that the circumstances do not place this case on the prison doctor side of the calculus for determining deliberate indifference, I cannot agree that the pressure was such that categorization of these circumstances as more equivalent to the hot pursuit scenario is appropriate either. Rather, I think, these facts place this case somewhere in the middle of the continuum of possibilities.

Moving to the second Lewis requirement, Judge Stapleton's "exact analysis" of the circumstances confronting the officers can be summed up in the conclusions noted above. The above-quoted passage from Judge Stapleton's opinion is the essence of his finding that the conduct of the officers was not deliberately indifferent to Ms. Schieber's needs at the time. In sum, Judge Stapleton made the following six conclusions: (1) the officers needed to make a decision without delay, (2) they were under pressure as a result of possessing only limited information, (3) the situation confronting them involved a judgment that required the weighing of important competing interests, (4) the judgment depended upon an evaluation of Greeley's report, (5) the officers made the required judgment, and (6) their conversation with the neighbors, particularly Greeley, supports the conclusion that they focused on the relevant considerations. As just noted, each of these statements or findings is a conclusion. As with any conclusion, it is proper to determine whether there is a factual basis. Based on the pretrial record, I believe that only one of these conclusions is properly supported, and within the competence of this court to make at this time, namely, the legal conclusion that there were competing interests of personal security and privacy.

Rule 702 of the Federal Rules of Evidence recognizes that there are occasions when a fact finder needs the assistance

of one with specialized knowledge in order to discharge its

responsibilities. I will not repeat my discussion of Judge Stapleton's application of the holding in Johnson v. Jones here. I think it is enough to point out that, before this court can judge the conduct of these officers, there must be greater development of the record so that the court can arrive at informed conclusions based upon adequately adduced facts and not its own well-intended but unguided supposition.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit