849 A.2d 1095

ESTATE OF MICHELLE STRUMPH, BY AND THROUGH HOWARD STRUMPH, ADMINISTRATOR AD PROSEQUENDUM, PLAINTIFF–APPELLANT, v. RICHARD VENTURA, THE TOWNSHIP OF VOORHEES POLICE DEPARTMENT, CHIEF KEITH HUMMEL, SGT. CHARLES GROVES, AND SGT. KURT CAMM, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted May 12, 2004—Decided May 28, 2004.

518

Before Judges CONLEY, CARCHMAN and WECKER.

*Jacobs & Barbone,* attorneys for appellant (*Louis M. Barbone,* on the brief).

*Garrigle and Palm,* attorneys for respondents (*William A. Garrigle,* of counsel; *Cynthia L. Sozio,* on the brief).

The opinion of the court is delivered by

CONLEY, P.J.A.D.

This is a tragic case. Howard and Michelle Strumph were married and resided in Voorhees with their two children, Jennifer, age ten, and Willem, age one. Howard has multiple sclerosis and is confined to a wheelchair, although he can walk with great effort. On the date in question, the Strumphs had hired Richard Ventura, the son of their cleaning lady, to help prepare for Willem's first birthday party. Howard heard his wife call for help from downstairs and wheeled to the landing to see what was going on. He observed Ventura attempting to sexually assault his wife. Howard activated the alarm system and retrieved his gun. In the meantime, Jennifer had called 911. While she was on the phone, Howard fired five shots at Ventura. Three shots hit him and he was rendered a paraplegic. One shot hit Michelle in the chest. She collapsed unconscious onto the floor. Unbeknownst to Howard, police officers were about to enter the house in response to Jennifer's 911 call when they heard the gunshots. Jennifer ran out of the house and told the police that her father had shot her mother and Ventura, who was "acting crazy."

The police did not enter the house for over an hour. Howard was on the phone with the police for the entire time pleading for officers to enter the home and provide medical attention to Michelle. The officers continually assured Howard that help was on the way. After a little over an hour, SWAT officers entered the home, but by then Michelle had expired. Howard filed a 42 *U.S.C.* § 1983 action on Michelle's behalf alleging that the officers and the Voorhees Police Department (VPD) acted with deliberate indifference and violated her constitutional rights by not intervening sooner. After full discovery, the defendants' motion for summary judgment was granted. Howard appeals; we affirm.

## I.

The focus of the 1983 claim is upon the delay in entering the home. We, therefore, limit our recitation of the summary judgment record to the facts, all undisputed, relating to the police

response. According to the VPD Dispatch Log, Jennifer's phone call came in at 3:15 p.m., and police were dispatched to the scene instantly, with the first unit arriving at 3:16 p.m. Six additional officers arrived between 3:16 and 3:26 p.m. Three more officers arrived between 3:40 and 3:47 p.m.

The supervising officer was Chief Hummel. His answers to interrogatories reflect that he was advised of the shooting at 3:26 p.m. and arrived at the scene at 3:30 p.m. The first ambulance was dispatched to the scene at 3:21 p.m. and arrived at the scene at 3:28 p.m. The SWAT team was initially dispatched at 3:22 p.m., and did not enter the home until approximately 4:31 p.m. Shots were heard being fired inside the residence at 3:24 p.m.

Ventura was removed from the house at 4:35 p.m. Michelle was transported from the scene by ambulance at 4:39 p.m. and arrived at the hospital at 4:43 p.m. The Voorhees Fire Department report's narrative section describes the paramedics' activities thusly:

> [The ambulance] was dispatched for standby for police activity. Crew was assigned ... to retrieve victims from a shooting. police handcarried [Michelle] to [the ambulance]. Patient was evaluated and found to have single gunshot wound to chest.... Patient was pulseless, lower extremities were mottled, upper extremities cyanotic. Patient determined obvious dead-on-arrival. Patient was transported to [the hospital] for pronouncement.

Chief Hummel testified during his deposition that he had no personal knowledge of Howard's condition before the incident. When he arrived on the scene, Jennifer told him that Ventura was "acting crazy" and that Howard had shot Michelle. He said that his first goal was for the SWAT team to enter the residence and remove the injured people, and the second was to take Howard into custody. Chief Hummel estimated that it took ten minutes from the time he left his office for the Strumph residence for the police to gather intelligence on the situation inside. He stated that within another five minutes, the plan was developed. When asked why officers did not enter the home during the fifteen minute period when the plan was being formulated, Chief Hummel stated:

> [P]atrol officers are not trained to take ground, property or space that is controlled by a person who is armed. . . . That situation, that's why they are just trying to contain the situation because the shooter has control of the interior of the house. He has control of the crime scene. We only have control outside the crime scene. They are trained to do that.

Chief Hummel also said that for an officer to approach a window in a house during a situation like the one in this case "would be a dangerous situation for that officer. He is exposing himself, in my opinion, to an unwarranted risk."

Finally, the initial officer dispatched to the scene wrote in his report:

> While en route we were advised by dispatch that the actor may have a knife and that his name is Richard Ventura. Upon arrival I exited my vehicle at which time I heard three or four gunshots in rapid succession. At this point all three officers obtained cover. I contacted dispatch and advised them that there were shots fired and requested additional units and that Chief Hummel be advised of this incident. I also requested that dispatch attempt to make telephone contact with anyone in this house. A short period of time after the first shots there was another shot. I was advised by dispatch that they were in contact with someone inside of the house and that the person doing the shooting was the male resident. At this point a young female exited the front door and walked down the walk way toward this officer. She was taken behind my vehicle. I asked her how many people were inside of the house and she stated that there were five people. Her father, her mother, her one year old brother Mr. Ventura and herself. I then asked her what had happened and she stated that her father was doing the shooting and that he had shot her mother. . . . Additional units began to arrive at the scene and a perimeter was set up around this house. At this point Chief Hummel arrived and a command post was established on Hardwick Dr. The SWAT team arrived and we were briefed. The team then approached this house at which time I was assigned to a cover position at the rear of the house. We were advised via radio that [Howard] was in the upper level of the house and that he would open the window shade and raise his hands. I observed a window shade on the upper level of the rear of the house being raised and I observed a male through that window with his arms raised. At this point the team made entry to the house through a double door located at the rear of the house.

One of plaintiff's experts prepared a report focusing upon the police activity at the scene. His ultimate conclusion was that "the command staff of the Voorhees Township Police Department, by it's failure to keep informed of the latest trends, tactics and developments, created an environment of deliberate indifference as to the tactics ... employed in respect to this call." He opined, also, that the failure of the VPD to train its officers how to

properly respond to "In–Progress Shooting/Evacuation under Fire situation[s] . . . may have been a contributing factor in its failure to provide timely medical assistance to the injured patients." The report discussed the history and development of SWAT teams and their techniques and detailed how other local police departments have used various readily available techniques to respond to in-progress shootings more quickly than the VPD. The expert concluded that the VPD "failed to respond appropriately" in this case:

Dispatcher McCloskey was told by Jennifer Strumph, "Somebody is acting crazy. My mom had somebody come over to help her and they are acting crazy." . . . He hears the screams of [Michelle] Strumph in the background and the alarm going off, then the report of gunshots. Simultaneous to the arrival of his first two patrol units and a field supervisor, who confirmed the reports of gunshots.

It was established that there were two gunshot victims and that the homeowner was the shooter. The fact of the case started off as a homeowner utilizing a firearm in defense of a third party (his wife) who was under attack by a male, and during the use of force by the homeowner, the wife was actually injured.

During my review of the materials, there were no signs of domestic violence, hostages being taken or the homeowner barricading himself in the house. Through prejudices or past experiences of the command staff, they conjured up a domestic violence scenario, and invoked a SWAT response to this Patrol situation.

This Command Staff was aware from the onset that there were two victims of penetrating trauma. They never had any consultation from on scene Emergency Medical Service personnel to the pre-hospital emergency care to trauma victims. If they were inclined to they would have learned of the "Golden Hour." The "Golden Hour" refers to the survivability of a trauma victim (the time elapsed between when the injury took place to the time it took to get that patient to definitive care,), which is one hour. . . .

Eight officers (two of them SWAT trained) and two supervisors (one SWAT trained) arrived within 5 minutes of the onset, and the ambulance arrived 2 minutes later. The development of information from an eye witness, Jennifer Strumph, upon her exit from the house, combined with the additional information from the home owner requesting medical assistance for his wife and the suspect, made it clear medical attention was immediately necessary.

. . . .

A suggested Patrol resolution to the call would have been the introduction of an element of SWAT personnel, by inserting SWAT Sergeant Groves along with SWAT Officers Rusterucci and Chuppe [the first three officers on the scene], with their offensive firearms utilizing their tactical training to clear a route for the Evacuation Team, of Sergeant Camm and Officer Murphy. The route of travel for the removal of the injured and the commands given to the homeowner to open the shade and put his hands up could have been the same. This would have left the other patrol officers to contain the scene.

... If the initial law enforcement officers responded in a timely fashion and implemented their basic patrol skills that they learned in the Academy, utilizing the offensive tools supplied to them by their department, or received training in respect to the handling of In–Progress Shooting and Evacuation under Fire, Mrs. Strumph may have left the home as a viable patient for the trauma center.

## II.

██ 42 *U.S.C.A.* § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Plaintiff claims here that the VPD's alleged failure in its response activities resulted in a deprivation of Fourteenth Amendment due process rights.

██ Where the police come upon a dangerous situation but fail to act, or fail to act appropriately, courts generally do not perceive such police response as constitutionally impermissible. *E.g., Schieber v. City of Philadelphia*, 320 *F.*3d 409, 419–20 (3d Cir.2003). Further, as a general rule, a state's failure to protect its citizens from private violence does not violate the Due Process Clause of the Fourteenth Amendment. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 *U.S.* 189, 195, 109 *S.Ct.* 998, 1003, 103 *L. Ed.*2d 249, 258 (1989) (*DeShaney* ).

██ In *DeShaney*, the plaintiff was a young boy whose father routinely abused him. State social workers were aware of the abuse, and while they took action, they did not remove the plaintiff from his father's custody. A few months later, the plaintiff's father beat him so severely that he was rendered permanently retarded and institutionalized. The plaintiff's mother filed a lawsuit on his behalf alleging a Due Process violation. In affirming the trial court's grant of summary judgment to the defendant, the Court explained that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which

the government itself may not deprive the individual." *Id.* at 196, 109 *S.Ct.* at 1003, 103 *L.Ed.*2d at 259. Since states have no affirmative duty to provide such services, they cannot be held liable for injuries that would have been averted had they chosen to provide them. *Id.* at 196–97, 109 *S.Ct.* at 1003–04, 103 *L.Ed.*2d at 259.

The Court did, however, discuss the "special relationship" exception to the general rule. This exception is limited to the duty to provide medical services to involuntarily committed mental patients, the duty of the police to provide medical services to people who are injured in the process of being arrested, and the duty not to move a child from state custody into an abusive foster home. *Id.* at 199, 109 *S.Ct.* at 1005, 103 *L.Ed.*2d at 261. *See also, Revere v. Mass. Gen. Hosp.,* 463 *U.S.* 239, 244, 103 *S.Ct.* 2979, 2983, 77 *L.Ed.*2d 605, 611 (1983); *Youngberg v. Romeo,* 457 *U.S.* 307, 102 *S.Ct.* 2452, 73 *L.Ed.*2d 28, (1982); *K.H. Through Murphy v. Morgan,* 914 *F.*2d 846 (7th Cir.1990).

Plaintiff does not argue the special relationship theory of recovery here. He relies upon what has been characterized as the "state-created danger" exception. This exception derives from the *DeShaney* Court's observation that: "While the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." *DeShaney, supra,* 489 *U.S.* at 201, 109 *S.Ct.* at 1006, 103 *L.Ed.*2d at 262. That language, in addition to the holdings of pre-*DeShaney* cases, has led other courts to find that a state can be held liable if it places a person in a position of danger that the person would not have been in without the state action. *See Kneipp v. Tedder,* 95 *F.*3d 1199, 1205 (3d Cir.1996) and cases cited thereto. *See also Gonzales v. City of Camden,* 357 *N.J.Super.* 339, 346, 815 *A.*2d 489 (App.Div. 2003).

Under this exception, a plaintiff injured by a private actor can succeed in an action against the state under § 1983 in certain limited circumstances. It can arise where:

(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

[*Kneipp v. Tedder, supra,* 95 *F.*3d at 1208.]

In the end, the touchstone for the analysis for this exception has been whether the state actors acted with "deliberate indifference". *Kneipp v. Tedder, supra,* 95 *F.*3d at 1208. *See also City of Canton v. Harris,* 489 *U.S.* 378, 388, 109 *S.Ct.* 1197, 1204, 103 *L.Ed.*2d 412, 426 (1989).

*Bryson v. City of Edmond,* 905 *F.*2d 1386 (10th Cir.1990), is instructive. There, multiple plaintiffs or their decedents were injured or killed in a workplace shooting. The police arrived at the scene within minutes of the onset of the shooting but did not attempt to enter the building for an hour and a half. The plaintiffs sued the police under § 1983. They claimed that the police were liable for restricting officer access to the building even though they knew about a secure entrance and were aware of the shooting, failing to employ the available SWAT team, failing to have proper policies in place, and failing to properly train their officers. *Id.* at 1388, n. 3. The district court disagreed, as did the Tenth Circuit. The court explained that the police "played no part in creating the danger to the victims, nor did they do anything to render them more vulnerable to those dangers." *Id.* at 1392. The plaintiffs alleged that the police prevented others from entering the building to rescue the injured, and their ninety minute delay in allowing entry was deliberately indifferent and caused the deaths of some victims who could have been saved with prompt medical attention. *Id.* at 1392, n. 11. The Court discounted that argument, explaining that "It is obvious, however, that believing there was a hostage situation inside, had the police permitted others to rush into the midst of the audible gunfire, there might have been some basis for charging recklessness or indifference towards the public and possibly towards those inside." *Id.* at 1392.

The Court then explained its rationale under the *DeShaney* framework:

> *DeShaney* involved private violence by a private actor; the Court emphasized that the victim was in the custody and control of his own father. While the state may have been aware of the dangers the *DeShaney* child faced, "it played no part in their creation, nor did it do anything to render him any more vulnerable to them . . it placed him in no worse position than that in which he would have been had it not acted at all." [*DeShaney, supra,* 489 *U.S.* at 201, 109 *S.Ct.* at 1006, 103 *L.Ed.*2d at 262.]
>
> In the case before us, limitations on the victims' liberty were imposed by their assailant . . . not by the police. *The fact that the police surrounded the post office when summoned to the scene did not create a special situation in which affirmative duties of protection arose. A contrary rule would impose constitutional duties on the police whenever they respond to reports of violence and assemble at the scene,* not just in "certain limited circumstances" and "with respect to particular individuals" as taught by *DeShaney.* [*Id.* at 198–99, 109 *S.Ct.* at 1004–05, 103 *L.Ed.*2d at 260.]
>
> [*Bryson v. City of Edmond, supra,* 905 *F.*2d at 1393 (emphasis added)].

The Third Circuit's decision in *Brown v. Commonwealth of Pa. Dept. of Health Emergency Med. Servs. Training Inst.,* 318 *F.*3d 473 (3d Cir.2003), is also instructive. There a one-year old boy died after choking on a grape. The paramedics arrived on the scene ten minutes after the first 911 call. The boy's family filed a lawsuit alleging § 1983 violations surrounding the incident. The Third Circuit reiterated the holdings of other federal circuit courts that under § 1983 and *DeShaney,* "there is no federal constitutional right to rescue services, competent or otherwise." *Id.* at 478. The Court then examined the exceptions to the *DeShaney* general rule. In discussing the deliberate indifference standard, the Third Circuit explained that for a plaintiff to prevail, the police conduct must shock the conscience "if the state actor had to act with urgency." *Id.* at 480. The paramedics' conduct in that case did not shock the conscience because the record indicated that they arrived at the scene as fast as they could. The Court held that although the paramedics failed to rescue the boy in time, "they had no constitutional obligation to do so." *Id.* at 481.

We adopted a similar analysis in *Gonzales v. City of Camden,* 357 *N.J.Super.* 339, 343, 347, 815 *A.*2d 489 (App.Div.2003). There, we upheld the grant of summary judgment to the defendant City

of Camden and some of its health inspectors. The inspectors arrived at a grocery store in a high-crime area of Camden at 9:30 p.m., when the store was closing, and demanded to do their inspection that night. The three owners expressed concern about their safety leaving the store at such a late hour, but the officials insisted. After the inspection, at about 10:00 p.m., the inspectors refused the owners' request to wait for them to close the store so that they could all leave together, as some of the inspectors were armed. The owners left about five minutes later and two of them were shot near their cars, one fatally. We concluded that:

[A] trier of fact could not find that defendants acted in wilful disregard for the safety of the plaintiffs. [*Kneipp, supra,* 95 *F.*3d at 1208.] In our view, the failure of the officials who conducted the inspection to accede to the brothers' request to remain a short while longer and escort them to their car could be found to constitute negligence. However, the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. *County of Sacramento v. Lewis,* 523 *U.S.* 833, 849, 118 *S.Ct.* 1708, 1718, 140 *L.Ed.*2d 1043, 1059 (1998). The only form of official conduct that can be found to violate the Due Process Clause is conduct that is so "egregious[ly]" wrongful that it "shocks the conscience." *Id.* at 846, 118 *S.Ct.* at 1716–17, 140 *L.Ed.*2d at 1057.

[357 *N.J.Super.* at 350, 815 *A.*2d 489.]

We observed: "Even a showing of 'deliberate indifference' to public safety may be insufficient in some circumstances to satisfy this high threshold for liability under the Due Process Clause." 357 *N.J.Super.* at 351, 815 *A.*2d 489 (citing *County of Sacramento v. Lewis, supra,* 523 *U.S.* at 849–54, 118 *S.Ct.* at 1718–21, 140 *L.Ed.*2d at 1059–62). Ultimately, though, we concluded:

Although a state court is free to require greater protections under its own constitution than are mandated by the United States Constitution, *see Robinson v. Cahill,* 62 *N.J.* 473, 490–91, 303 *A.*2d 273 (1973), the standards established in *Kneipp [v. Tedder, supra,* 95 *F.*3d at 1208] for determining whether official conduct violates the Due Process Clause sufficiently protect personal security interests. [357 *N.J.Super.* at 351, 815 *A.*2d 489].

We have previously set forth the four-prong *Kneipp* test. *See, supra,* at pp. 525–26, 849 *A.*2d at 1101. The motion record, even viewed most favorably for plaintiff, does not establish the second and fourth prongs of this test. The second prong is whether the defendants acted with willful disregard for Michelle's safety.

From the record provided, it appears that defendants were cognizant of Michelle's predicament, but also concerned for the safety of the police officers and paramedics at the scene. Willful disregard implies that defendants knowingly ignored Michelle's situation. While a reasonable juror might conclude the VPD's actions were negligent, no reasonable juror could conclude those actions were the product of a knowing disregard for Michelle's situation.

The fourth prong is whether defendants used their authority to create an opportunity that otherwise would not have existed for the injury to occur. Plaintiff cannot satisfy this prong because Howard shot Michelle before defendants became involved. *See Reed v. Gardner,* 986 *F.*2d 1122 (7th Cir.), *cert. denied,* 510 *U.S.* 947, 114 *S.Ct.* 389, 126 *L.Ed.*2d 337 (1993) (police arrested sober driver and left drunk passenger in car with keys; drunk passenger got in accident after attempting to drive home); *Wood v. Ostrander,* 879 *F.*2d 583 (9th Cir.1989), *cert. denied,* 498 *U.S.* 938, 111 *S.Ct.* 341, 112 *L.Ed.*2d 305 (1990) (police arrested a drunk driver in a high-crime area, impounded her car, left her to walk home, and she was subsequently raped); *Mason v. Barker,* 977 *F.Supp.* 941 (E.D.Ark.1997) (police instructed an overly medicated person they knew to be a danger to herself and others to leave town by driving her car and an accident ensued).

Plaintiff relies upon *Sanders v. Bd. of County Comm'rs of the County of Jefferson, Colo.,* 192 *F.Supp.*2d 1094 (D.Colo.2001). There the personal representative of a teacher killed in the Columbine shootings sued various state agencies and law enforcement officers for § 1983 violations. In that case, two students went on an unprecedented shooting spree in their high school. They started shooting upon their arrival at the school at 11:17 a.m., killing two students and wounding seven others before even entering the building. Two sheriff's deputies on the scene exchanged gunshots with the shooters in front of the building, and then the shooters entered the school. The first 911 call from the school came in at 11:21 a.m. A massive police and rescue response was summoned to the school. By 11:30 a.m., command of the

police and rescue efforts had been established at the scene. At 11:40 a.m., Sanders was shot. By 12:15 p.m., the two shooters committed suicide inside the school. By 12:30 p.m., news of the suicides had been relayed to the on-site command center from officers posted on nearby rooftops with binoculars and telescopic rifles. "Despite this information, and in contradiction to the Jefferson County Sheriff's Department Manual, the Command Defendants, initially and for the rest of the afternoon, characterized the situation as a 'hostage' situation rather than a 'high risk' situation." *Id.* at 1102. Notwithstanding mounting communications of the teacher's worsening condition, he was not reached by the SWAT team until late afternoon. Moreover, Command Defendants' instructions during the day were conflicting, untrue and hindered the teacher's rescue. For instance, at one point people in the teacher's area told the Command Defendants that they were going to break a window and obtain help for him. The Command Defendants warned that such behavior would alert the shooters to their location even though Command Defendants knew that the shooters were dead. When a SWAT team entered the building against the orders of the Command Defendants and was in radio contact with the Command Defendants, they were never told of teachers' condition or location. That location was the last to be reached on the day in question, and as a result, the teacher was the last wounded person reached by SWAT team members, despite being the only wounded person known to the Command Defendants to be in urgent need of life-saving treatment.

The district court denied the Command Defendants' motion to dismiss. It found that the gunshot wounds were life threatening but remained survivable for at least three hours, and that the failure of the Command Defendants to effectuate a Sanders' rescue placed the teacher "in the path of substantial risk of serious, immediate, and proximate harm." *Id.* at 1110. The court held that since the injuries were survivable for a period of hours, the delaying of medical treatment was a "distinct, albeit related" cause of the danger. *Id.* at 1111 (emphasis omitted).

*Sanders* is distinguishable. Here, the police had to balance two competing, protected interests, Michelle's right to personal security, and the right to personal security of the paramedics and police officers. In *Sanders,* there was no need for a balancing test as the teacher's right to personal security had no counterbalance since the Command Defendants knew the threat was extinguished. Moreover, here the only assurances the defendants had that the situation was safe came from the shooter himself. At this point, they did not know the veracity of Ventura's claimed assault, and had only Jennifer's statement that her father had shot her mother as an account of what had happened inside. There was no independent confirmation that the situation inside was not dangerous. *Sanders* also featured contradictory and inconsistent command decisions. In this case defendants maintained a consistent plan of action which unfortunately was not able to rescue Michelle.

Plaintiff claims, too, § 1983 liability for "action taken pursuant to a municipal policy or custom" which has resulted in a deprivation of a constitutional right. *Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Servs., supra,* 318 *F.*3d at 482. In particular, plaintiff alleges that the Chief's policy of "maintenance of a perimeter" reflects the municipality's failure to adequately train its police. In *City of Canton v. Harris, supra,* 489 *U.S.* at 380, 109 *S.Ct.* at 1200, 103 *L.Ed.*2d at 421, the United States Supreme Court determined that a municipality can be liable for a failure to properly train its police officers. *See also Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Servs., supra,* 318 *F.*3d at 482. But the failure to train must amount to deliberate indifference to those people with whom the police come into contact. *City of Canton v. Harris, supra,* 489 *U.S.* at 388, 109 *S.Ct.* at 1204, 103 *L. Ed.*2d at 426; *Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Medical Servs., supra,* 318 *F.*3d at 482.

As we have said, here, the "policy" of setting up a perimeter and determining that the location was safe for rescue personnel before allowing their entry into the location is not one which reflects

deliberate indifferences. Rather, it reflects balancing the security interests of both victims and potential rescuers and a determination that police and rescue activities must be done with safety for the officers and rescuers secured before entry into an unknown and dangerous situation. At best, plaintiff's expert opined that the VPD could have moved in sooner, that their concerns were not valid or could have been otherwise handled. Perhaps so, but nothing in the record reflects a policy of deliberate indifference.

Affirmed.