29 A.3d 336

LORRAINE GORMLEY, PLAINTIFF–RESPONDENT, v. LATANYA WOOD–EL, CHIEF EXECUTIVE OFFICER, ANCORA PSYCHIATRIC HOSPITAL; JENNIFER VELEZ, CURRENT COMMISSIONER, AND WILLIAM WALDMAN, FORMER COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES; KEVIN MARTONE, CURRENT ASSISTANT COMMISSIONER, AND ALAN G. KAUFMAN, FORMER DIRECTOR, DIVISION OF MENTAL HEALTH SERVICES, DEPARTMENT OF HUMAN SERVICES, DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued January 26, 2011—Decided October 18, 2011.

428

Before Judges CUFF, SAPP–PETERSON and FASCIALE.

*Randall B. Weaver,* Deputy Attorney General, argued the cause for appellants (*Paula T. Dow,* Attorney General, attorney; *Mr. Weaver,* on the brief).

*Justin T. Loughry* argued the cause for respondent (*Loughry and Lindsay, L.L.C.,* attorneys; *Mr. Loughry,* on the brief).

The opinion of the court was delivered by

SAPP–PETERSON, J.A.D.

We granted defendants leave to appeal an interlocutory order denying their motion for summary judgment based upon qualified immunity. Plaintiff, an attorney, commenced an action against

defendants asserting common law and civil rights claims, stemming from the physical attack during the course of a meeting with her client, a patient at Ancora Psychiatric Hospital (Ancora). Plaintiff alleges that she sustained both physical and mental injuries as a result of the attack. Plaintiff claims the attack was caused by a state-created danger that violated her substantive due process right under the Fourteenth Amendment to the United States Constitution. In denying defendants' motion, the motion judge concluded that the question of whether plaintiff's injuries resulted from a state-created danger and whether defendants were entitled to qualified immunity were factual questions for the jury.

We hold that the facts, when viewed most favorably towards plaintiff, raise a triable issue of fact as to whether defendants affirmatively placed plaintiff in a position of danger for purposes of asserting a substantive due process claim under the Fourteenth Amendment. We additionally hold that whether defendants are entitled to qualified immunity is a question of law for resolution by the court. In that regard, we conclude, because the right asserted was not clearly established at the time plaintiff was attacked, defendants are entitled to qualified immunity.

I.

The factual allegations surrounding plaintiff's claims are not disputed. At the time of her attack she was employed by the Department of the Public Advocate [1] and assigned to represent clients with mental illnesses in connection with their commitment to, treatment at, and discharge from psychiatric hospitals. On September 22, 2005, plaintiff went to Ancora to interview her clients in preparation for their weekly court hearings. During the

---

[1] The Department of the Public Advocate, created in 1974, was abolished in 1994 and restored in 2005, and once again abolished under Chapter 34, Laws of 2010. The Division of Mental Health Advocacy, to which plaintiff was assigned, was transferred to the Office of the Public Defender. *2011 New Jersey Lawyers Diary and Manual* 318.

course of the interview, without warning, B.R. attacked plaintiff, hitting her in the face while plaintiff's head was turned towards her notes. B.R. struck plaintiff several times, and when she attempted to flee, B.R. grabbed plaintiff by the hair and pulled her backwards until her head hit the floor. Plaintiff fought B.R. but claims she lapsed in and out of consciousness. Plaintiff recalled the hospital staff simply encouraging her to kick B.R., but that they did not attempt to immediately rescue her from the attack.

Ancora is a state psychiatric hospital administered by the New Jersey Division of Mental Health Services, a division of the Department of Human Services. The majority of patients at Ancora have been involuntarily committed.

Ancora has a well-documented history of problems. In the years preceding plaintiff's assault, the facility experienced hundreds of incidents of violence involving patient-to-patient attacks, as well as attacks upon staff and visitors. For example, between October 2003 and December 2005, there were 3,848 substantiated assaults, of which 810 involved assaults upon staff or visitors, and of that number, at least 200 resulted in injuries. Defendants were also aware, prior to the attack upon plaintiff, of multiple events of violence against professionals meeting with patient-clients. However, notwithstanding the documented and undisputed high incidence of assaultive behavior exhibited by its patients, Ancora did not afford attorneys such as plaintiff a secure location to conduct client interviews, nor implement any reliable system to monitor interview sessions between attorneys and their clients.

On the day that plaintiff conducted her interview of B.R., she met with him in the day room of Cedar Building A. The day room is a multi-purpose room where patients congregate. Plaintiff sat at a small table while she interviewed B.R. She positioned herself catty-corner at the table, rather than across from B.R., because the loud conditions in the day room prevented her from conducting the interview from a safer distance.

B.R. had been admitted to Ancora for sixteen days at that point and had been identified as requiring "close visual observation" (CVO), meaning that a staff member should keep the patient within eyesight at all times. No staff member, however, positioned himself or herself within sufficient proximity of plaintiff and B.R. during the interview, in order to respond quickly to any emergency. Nor did any staff person alert plaintiff to B.R.'s CVO status.

Plaintiff subsequently commenced a civil action against defendants, asserting both common law and civil rights claims. When defendants filed their summary judgment motions, they also sought dismissal of plaintiff's common law claims. The court granted this motion, and plaintiff did not seek leave to file an interlocutory appeal of this ruling.

As to the civil rights claim, which survived summary judgment, plaintiff's theory of liability is based upon her claim that defendants violated her right to substantive due process. Specifically, plaintiff contends that as B.R.'s attorney, she was responsible for rendering constitutionally-mandated legal services to a mentally ill client housed in a facility that defendants administered and controlled. Plaintiff maintains defendants were aware the professional services she rendered were provided under a locked custodial environment and that the physical conditions under which she provided legal services to B.R. were controlled by defendants. As a consequence, plaintiff urges "[t]he facts show a stubborn and chilling indifference on defendants' part to . : . [her] right to be free of a state-created danger, in an environment where ... [she] was wholly dependent upon ... defendants[,] her litigation adversaries[,] for her security[.]"

Defendants contend the court erred in concluding that the question of whether they are entitled to qualified immunity is a question of fact for the jury. They urge that the determination is a question of law and that the determination requires that they be granted qualified immunity. We agree.

## II.

■■■■ "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 *U.S.* 223, 231, 129 *S.Ct.* 808, 815, 172 *L.Ed.*2d 565, 573 (2009) (quoting *Harlow v. Fitzgerald*, 457 *U.S.* 800, 818, 102 *S.Ct.* 2727, 2738, 73 *L.Ed.*2d 396, 410 (1982)). A government official is entitled to qualified immunity unless his or her conduct violated "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ibid.* A clearly established right is one which is sufficiently clear and would cause a reasonable official to understand that his or her conduct violated that right. *Anderson v. Creighton*, 483 *U.S.* 635, 640, 107 *S.Ct.* 3034, 3039, 97 *L.Ed.*2d 523, 531 (1987). There is no requirement that a plaintiff prove that the precise act in question was previously held to be unlawful. *Ibid.* Rather, the focus of the inquiry must be whether "the right the official is alleged to have violated was 'clearly established' in a more particularized, and hence more relevant, sense[.]" *Ibid.* (quoting *Mitchell v. Forsyth*, 472 *U.S.* 511, 535 n. 12, 105 *S.Ct.* 2806, 2820 n. 12, 86 *L.Ed.*2d 411, 431 n. 12 (1985)). The determination of whether a government official is entitled to qualified immunity is a question of law for resolution by the court and should "be decided [as] early in the proceedings as possible, preferably on a properly supported motion for summary judgment[.]" *Wildoner v. Borough of Ramsey*, 162 *N.J.* 375, 387, 744 *A.*2d 1146 (2000).

■■■■ In *Saucier v. Katz*, 533 *U.S.* 194, 121 *S.Ct.* 2151, 150 *L.Ed.*2d 272 (2001), the Court outlined a two-tiered inquiry for determining whether qualified immunity should insulate government officers.[2] The first step is determining whether, "[t]aken in

---

[2] *Pearson* modified *Saucier's* two-step process concluding that "a mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Pearson, supra*, 555 *U.S.* at 234, 129 *S.Ct.* at 817, 172 *L.Ed.*2d at 575. The Court

the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id.* at 201, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 281 (citing *Siegert v. Gilley,* 500 *U.S.* 226, 232, 111 *S.Ct.* 1789, 1793, 114 *L.Ed.*2d 277, 287 (1991)). As to the second step, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Ibid.* The Court emphasized that this second step, whether the right was clearly established, "must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" *Ibid.* Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 282.

### A.

■ Addressing the first step in a *Saucier* analysis, plaintiff asserts a constitutional claim against defendants pursuant to 42 *U.S.C.A.* § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

■ Section 1983 is not the source of any substantive rights. *Baker v. McCollan,* 443 *U.S.* 137, 144 n. 3, 99 *S.Ct.* 2689, 2694 n. 3, 61 *L.Ed.*2d 433, 442 n. 3 (1979). Rather, it merely establishes

---

further concluded that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236, 129 *S.Ct.* at 818, 172 *L.Ed.*2d at 576. Instead, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Ibid.* We exercise our discretion to follow the *Saucier* approach.

remedies for deprivations of rights otherwise established in the United States Constitution or federal statutes. *Ibid.* Thus, to maintain an action under Section 1983, a plaintiff must present the requisite proofs establishing that (1) the offending conduct "was committed by a person acting under color of state law"; and (2) the conduct at issue deprived the plaintiff of a federal constitutional or statutory right. *Parratt v. Taylor,* 451 *U.S.* 527, 535, 101 *S.Ct.* 1908, 1913, 68 *L.Ed.*2d 420, 428 (1981), *overruled on other grounds* by *Daniels v. Williams,* 474 *U.S.* 327, 330–31, 106 *S.Ct.* 662, 664, 88 *L.Ed.*2d 662, 668 (1986). At issue in the present matter is only the second requirement, which is essential to determining the first prong of the *Saucier* test: the existence of a constitutional or statutory right that was violated. *Saucier, supra,* 533 *U.S.* at 201, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 281.

Plaintiff contends that her constitutional right to substantive due process under the Fourteenth Amendment was violated when defendants created, through their policies and practices related to attorney-client interviews, serious risks of harm and peril to her while she was rendering constitutionally-mandated legal services to a mentally ill client. Defendants do not dispute the particular circumstances under which plaintiff interviewed her client at the time of the incident or the interview conditions to which she was subjected in order to represent her client. Nor do defendants dispute the reported incidents of violence committed by patients at Ancora prior to the attack upon plaintiff. Instead, defendants maintain that plaintiff's allegations amount to a failure to provide "a safe working environment in a mental hospital" and that plaintiff cited to no decision that elevates such failures to a constitutional right.

In *DeShaney v. Winnebago County Department of Social Services,* 489 *U.S.* 189, 195–96, 109 *S.Ct.* 998, 1003, 103 *L.Ed.*2d 249, 258–59 (1989), the Court held that a state's failure to protect its citizens from acts of violence by private parties does not violate the Due Process Clause of the Fourteenth Amendment. The Court reasoned that the purpose underlying the Fourteenth

Amendment is "to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196, 109 *S.Ct.* at 1003, 103 *L.Ed.*2d at 259. The plaintiff in *DeShaney* sought to impose constitutional liability upon the defendant social workers who had reason to believe that a father was physically abusing his son, but failed to take the necessary steps to remove the child from his father's custody. *Id.* at 193, 109 *S.Ct.* at 1002, 103 *L.Ed.*2d at 257. The Court noted that the harm inflicted upon the minor child did not occur while the child was in the state's custody and that the father was in no sense a "state actor." *Id.* at 201, 109 *S.Ct.* at 1006, 103 *L.Ed.*2d at 262. The Court stated:

In the substantive due process analysis, it is the [s]tate's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

[*Id.* at 200, 109 *S.Ct.* at 1006, 103 *L.Ed.*2d at 262.]

The Court did not, however, completely reject all causes of action based upon a claim that a state actor breached its affirmative duty to protect an individual against private violence. *Id.* at 199–200, 109 *S.Ct.* at 1005–06, 103 *L.Ed.*2d at 261–62. The Court held that where a special relationship exists between a state and a private individual, that special relationship would impose affirmative duties of care and protection in certain limited circumstances, such as when a state takes a person into its custody and holds him there against his will. *Id.* at 199–200, 109 *S.Ct.* at 1005, 103 *L.Ed.*2d at 261. It found no such special relationship under the facts before it, stating that "[w]hile the [s]tate may have been aware of the dangers that [the minor child] faced in the free world, it played no part in their creation, nor did it do anything to render [the minor child] any more vulnerable to them." *Id.* at 201, 109 *S.Ct.* at 1006, 103 *L.Ed.*2d at 262.

A number of the federal circuits, including the Third Circuit, have construed this language as supporting "a state-created danger theory to establish a constitutional claim under 42 *U.S.C.[A.]* § 1983." *Kneipp v. Tedder,* 95 *F.*3d 1199, 1205 (3d Cir.1996)

(citing *Uhlrig v. Harder,* 64 *F.*3d 567, 572 n. 7 (10th Cir.1995), *cert. denied,* 516 *U.S.* 1118, 116 *S.Ct.* 924, 133 *L.Ed.*2d 853 (1996); *Dwares v. City of New York,* 985 *F.*2d 94, 99 (2d Cir.1993); *Reed v. Gardner,* 986 *F.*2d 1122, 1125 (7th Cir.), *cert. denied,* 510 *U.S.* 947, 114 *S.Ct.* 389, 126 *L.Ed.*2d 337 (1993); *Freeman v. Ferguson,* 911 *F.*2d 52, 55 (8th Cir.1990)). The *Kneipp* court also noted that "two other courts of appeals, in decisions predating *DeShaney,* recognized the state-created danger theory as a basis for establishing a constitutional claim under section 1983." *Ibid.* (citing *Cornelius v. Town of Highland Lake,* 880 *F.*2d 348 (11th Cir.1989), *cert. denied,* 494 *U.S.* 1066, 110 *S.Ct.* 1784, 108 *L.Ed.*2d 785 (1990); *Wood v. Ostrander,* 879 *F.*2d 583 (9th Cir.1989), *cert. denied,* 498 *U.S.* 938, 111 *S.Ct.* 341, 112 *L.Ed.*2d 305 (1990)).

■ Application of the state-created danger theory of constitutional liability requires proof of four elements:

(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

[*Id.* at 1208 (quoting *Mark v. Borough of Hatboro,* 51 *F.*3d. 1137, 1152 (3d Cir.), *cert. denied,* 516 *U.S.* 858, 116 *S.Ct.* 165, 133 *L.Ed.*2d 107 (1995)).]

Defendants contend that plaintiff's "proofs and theory of liability plainly do not satisfy the fourth requirement, that the State actors affirmatively used their authority in a way that created a danger to [plaintiff] or that rendered [plaintiff] more vulnerable to danger than had the [S]tate not acted at all." [3]

■ "[U]nder the fourth element of a state-created danger claim, 'liability under the state-created danger theory is predicated

---

[3] In their summary judgment motion, defendants argued that plaintiff failed to satisfy any of the four elements of state-created danger theory of liability. On appeal, defendants contend that the focus of their argument is the fourth prong, although they do not concede the first three prongs. Because defendants do not address the first three prongs in their brief, we conclude any arguments related to those prongs have been abandoned. *Liebling v. Garden State Indem.,* 337 *N.J.Super.* 447, 465–66, 767 *A.*2d 515 (App.Div.) ("[A]n issue not briefed … is deemed waived."), *certif. denied,* 169 *N.J.* 606, 782 *A.*2d 424 (2001).

upon the states' *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger.' " *Bright v. Westmoreland Cnty.*, 443 *F*.3d 276, 282 (3d Cir.2006) (quoting *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 *F*.2d 1364, 1374 (3d Cir.1992), *cert. denied,* 506 *U.S.* 1079, 113 *S.Ct.* 1045, 122 *L.Ed.*2d 354 (1993)). "It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Ibid.*

Defendants also urge that plaintiff cannot satisfy the fourth element because courts have rejected the state-created danger theory of constitutional liability in the context of public employees harmed during the course of their employment. To support this contention, defendants rely upon *Collins v. City of Harker Heights,* 503 *U.S.* 115, 112 *S.Ct.* 1061, 117 *L.Ed.*2d 261 (1992); *Uhlrig, supra,* 64 *F*.3d at 575; *Washington v. District of Columbia,* 802 *F*.2d 1478 (D.C.Cir.1986), and *Rutherford v. City of Newport News,* 919 *F.Supp.* 885 (E.D.Va.1996), *aff'd,* 107 *F*.3d 867 (4th Cir.1997). These decisions, however, all involve claims asserted by or on behalf of employees against their employer.

In *Collins,* the decedent, a city sanitation worker, succumbed to asphyxia after entering a manhole to unstop a sewer line. His widow attempted to assert a civil rights claim against the city. 503 *U.S.* at 117, 112 *S.Ct.* at 1064, 117 *L.Ed.*2d at 268. In *Uhlrig,* the plaintiff's decedent was an activity therapist in a mental institution who was killed by a patient previously housed in a special unit reserved for the criminally insane, until hospital administrators closed the unit and integrated those patients into the general population. 64 *F*.3d 567, 570–71. Finally, in *Rutherford,* the plaintiff's decedent was a police officer killed when a sting operation went awry. 919 *F.Supp.* at 887. In each of the cases, the attempt to elevate what was essentially a worker's compensation claim against the employer to a constitutional claim was rejected.

Here, plaintiff was not an Ancora employee at the time she was attacked. Nor was she an employee of the Department of Human Services or any of its divisions. She was there in her capacity as

an attorney employed by the Department of Public Advocate. Plaintiff's workplace was at the offices of the Public Advocate, a location where her client could not meet with her. While not in custody in the typical sense, as is the case of an inmate or involuntarily committed mental patient, plaintiff nonetheless had no ability to dictate the conditions under which she met with her client, including the location of the consultation session. She was required, as part of the performance of her duties as an attorney, to perform that representation in a confined setting. She did not have access to her client's hospital chart. She was not apprised of his CVO status. In addition, plaintiff's client was in a confined situation. Although not incarcerated, he was not free to leave because he had been involuntarily committed. As such, it was known to the Ancora staff in a general sense that plaintiff's client had been determined to pose a risk of harm to himself and to others, and it was additionally known to the staff that his recent behavior had required CVO status. Plaintiff's only choice of location for meeting with her client was within the confines of Ancora. Thus, plaintiff's liberty was restrained, albeit in a temporary sense, as soon as she entered Ancora to provide the constitutionally-mandated services. *DeShaney, supra,* 489 *U.S.* at 200, 109 *S.Ct.* at 1006, 103 *L.Ed.*2d at 262. As such, the particular circumstances here are what the *DeShaney* Court characterized as "other similar restraint of personal liberty," *ibid.,* for which a "special relationship" would ordinarily mandate affirmative action by government officials to ensure the safety of the person whose liberty has been restrained by government action. *Id.* at 199–200, 109 *S.Ct.* at 1005–06, 103 *L.Ed.*2d at 261–62.

Defendants were acutely aware of the history of assaultive behavior by its patients against not only other patients and staff, but also upon visitors such as plaintiff. Yet, defendants failed to take appropriate measures to safeguard individuals such as plaintiff from physical attack. We therefore reject defendants' contention that their failure to act does not satisfy the fourth prong.

 The Constitution has been characterized as "a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Bowers v. DeVito*, 686 *F*.2d 616, 618 (7th Cir.1982). There are, however, circumstances where a state's inaction becomes so egregious that it amounts to creating the danger or increasing the risk of harm. *Ibid.* Under such circumstances, a state may not avoid constitutional liability based upon a claim that it took no affirmative action to create the danger:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.
>
> [*Ibid.*]

Plaintiff here was a "discrete" plaintiff. *Kneipp, supra*, 95 *F*.3d, at 1208 (citing *Mark, supra*, 51 *F*.3d at 1153). When the facts are viewed most favorably towards her, defendants used their " 'peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury' " by their deliberate indifference to her safety needs, an indifference extending beyond mere negligence. *Ibid.* (quoting *Mark, supra*, 51 *F*.3d at 1153).

### B.

 Because the facts viewed most favorably towards plaintiff satisfy a state-created danger theory of constitutional liability, the next inquiry is whether the right violated was clearly established. *Saucier, supra*, 533 *U.S.* at 201, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 281. Defendants urge there is no case law that put them on notice of a Fourteenth Amendment duty to provide plaintiff with a safe working environment. On the other hand, plaintiff contends the state-created danger theory of liability was well-established at the time her client attacked her and that this theory of constitutional liability has been recognized for a number of years.

We agree that a state-created danger theory of constitutional liability has been recognized in circuit courts for a number of years and that those decisions have been cited with approval in this jurisdiction. In *Estate of Strumph v. Ventura,* the plaintiff filed a Section 1983 action alleging that local police acted with deliberate indifference and violated his spouse's constitutional rights when they delayed, for more than one hour, entering his home after he accidentally shot her in an effort to defend her against a sexual assault being perpetrated by the son of their cleaning lady. The plaintiff shot the attacker, but the shots fired also fatally injured his spouse. Unbeknownst to the plaintiff, when police were about to enter the residence, the plaintiff's daughter ran from the home, telling police that her father "had shot her mother and Ventura, who was 'acting crazy.'" 369 *N.J.Super.* 516, 520, 849 *A.*2d 1095 (App.Div.), *certif. denied,* 181 *N.J.* 546, 859 *A.*2d 691 (2004). Citing to a number of federal decisions, we recognized the viability of a state-created danger theory of liability under Section 1983. *Id.* at 525, 849 *A.*2d 1095. We concluded, however, the facts did not support its application in the underlying matter:

> Here, the police had to balance two competing, protected interests, Michelle's right to personal security, and the right to personal security of the paramedics and police officers.... [T]he only assurances the defendants had that the situation was safe came from the shooter himself. At this point, they did not know the veracity of Ventura's claimed assault, and had only Jennifer's statement that her father had shot her mother as an account of what had happened inside. There was no independent confirmation that the situation inside was not dangerous.
>
> ....
>
> ... [T]he "policy" of setting up a perimeter and determining that the location was safe for rescue personnel before allowing their entry into the location is not one which reflects deliberate indifferences. Rather, it reflects balancing the security interests of both victims and potential rescuers and a determination that police and rescue activities must be done with safety for the officers and rescuers secured before entry into an unknown and dangerous situation.
>
> [*Id.* at 531–32, 849 *A.*2d 1095.]

We also acknowledged the viability of a state-created danger theory of liability in *Gonzales v. City of Camden,* 357 *N.J.Super.* 339, 346, 815 *A.*2d 489 (App.Div.2003). There, local officials insisted upon conducting a random inspection of a grocery store

when the proprietors were closing the store. Once the inspectors completed their inspection, they refused the proprietors' request to remain while they closed the store so everyone could leave together. *Id.* at 343–44, 815 *A*.2d 489. We found no affirmative conduct actionable under a state-created danger theory of liability when one of the proprietors was shot and fatally wounded five minutes after the inspectors left the store. *Id.* at 344, 815 *A*.2d 489.

Notwithstanding our recognition of a state-created danger theory of constitutional liability in *Strumph* and *Gonzales*, our analysis here is guided by the Supreme Court's decision in Anderson. There, the Court instructed that courts focus not upon general principles of liability when considering application of qualified immunity but upon the particular contours of the right that is alleged to have been violated:

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth* ], (3)27 [472 *U.S.* 511,] . . . 535 n. 12, [105 *S.Ct.* 2806, 2820 n. 12, 86 *L.Ed.*2d 411, 431 n. 12 (1985) ]; but it is to say that in the light of pre-existing law the unlawfulness must be apparent. *See, e.g., Malley* [*v. Briggs* ], . . . [475 *U.S.* 335,] . . . 344–[ ]45, [106 *S.Ct.* 1092, 1097–98, 89 *L.Ed.*2d 271 (1986) ]; *Mitchell, supra*, [472 *U.S.*] at 528, 105 *S.Ct.* at 2816, 86 *L.Ed.*2d at 426; *Davis* [*v. Scherer*, 468 *U.S.* 183,] 191, 195[, 104 *S.Ct.* 3012, 3017, 3019, 82 *L.Ed.*2d 139, 147, 150 (1984).]

> [*Anderson, supra*, 483 *U.S.* at 640, 107 *S.Ct.* at 3039, 97 *L.Ed.*2d at 531.]

Thus, to limit the analysis to simply recognizing that a state-created danger theory of liability has been in existence for many years, as plaintiff urges us to do, would

> convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases. strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis, supra*, [468 *U.S.*] at 195[, 104 *S.Ct.* at 3019, 82 *L.Ed.*2d at 150 (1984).]

[*Id.* at 639–40, 107 *S.Ct.* at 3039, 97 *L.Ed.*2d at 530.]

The Court in *Saucier* reiterated, with approval, the necessity for a particularized analysis. 533 *U.S.* at 201, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 281. The plaintiff in *Saucier*, an animal rights protestor, alleged that the defendant police officer violated his Fourth Amendment rights by using excessive force to arrest him. *Id.* at 198–99, 121 *S.Ct.* at 2154–55, 150 *L.Ed.*2d at 280. In reversing the denial of the grant of qualified immunity to the arresting officer, the Court noted the clear prohibition under the Fourth Amendment against the use of excessive force:

[T]here is no doubt that *Graham v. Connor*, [490 *U.S.* 386, 109 *S.Ct.* 1865, 104 *L.Ed.*2d 443 (1989),] ... clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough.... The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Wilson v. Layne*, 526 *U.S.* 603, 615, 119 *S.Ct.* 1692, 143 *L.Ed.*2d 818 (1999) ("As we explained in Anderson, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established").

[*Id.* at 201–02, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 281–82.]

Applying a particularized analysis to the present matter, we observe that cases recognizing a state-created danger theory of constitutional liability have heretofore typically involved affirmative acts on the part of government officials, which placed the plaintiffs in a position of danger distinct from that facing the public at large. *See Kneipp, supra,* 95 *F.*3d at 1212; *see also Cornelius v. Town of Highland Lake,* 880 *F.*2d 348, 352 (11th Cir.1989). Here, defendants did not engage in any affirmative acts to create the dangerous condition. Rather, it was defendants' full knowledge of, but deliberate indifference to, the foreseeable risk of harm to plaintiff that is at issue.

The decisional law imposing constitutional liability based upon deliberate indifference has generally been limited to those circumstances where there has been a special relationship between a state and a private individual, such as "when the State takes a person into its custody and holds him there against his will[.]" *DeShaney, supra,* 489 *U.S.* at 199–200, 109 *S.Ct.* at 1006, 103

L.Ed.*2d* at *261*; see also Youngberg v. Romeo, *457* U.S. *307, 321–22, 102* S.Ct. *2452, 2461, 73* L.Ed.*2d 28, 41 (1982) (holding that involuntarily committed mental patients have a substantive due process right to such services as are necessary to ensure their reasonable safety);* Estelle v. Gamble, *429* U.S. *97, 104–05, 97* S.Ct. *285, 291, 50* L.Ed.*2d 251, 260 (1976) (finding that an Eighth Amendment violation may be established with proof of deliberate indifference to an inmate's need for adequate food, safety and shelter).*

Plaintiff was neither among that class of persons, such as inmates or mental patients, for whom a special relationship existed, nor a private citizen to whom the State owed no affirmative duty against harm committed by a private citizen. *DeShaney, supra,* 489 *U.S.* at 193, 109 *S.Ct.* at 1002, 103 *L.Ed.*2d at 257. Rather, plaintiff was a private citizen, but at the same time a private citizen whose liberty to perform her legal representation was restrained because of the unique circumstances that attended her provision of those constitutionally-mandated legal services to confined mental patients. She performed her legal representation at a location and in an environment completely controlled by defendants. The "contours of [her] right" in this essentially hybrid status were not clearly articulated at the time of her attack and continue to remain unclear, not having been addressed by the Supreme Court or our Court. *Anderson, supra,* 483 *U.S.* at 640, 107 *S.Ct.* at 3039, 97 *L.Ed.*2d at 531. Consequently, there is no basis to conclude that defendants reasonably understood or should have understood that their policies and practices regarding attorneys representing Ancora patients violated plaintiff's Fourteenth Amendment substantive due process right to security in the performance of her legal representation. *Ibid.* Therefore, defendants are entitled to qualified immunity.

Reversed and remanded for the entry of an order granting summary judgment dismissing plaintiff's Section 1983 claims against defendants.